[No. S007531. Aug. 26, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
KEVIN BERNARD HALEY, Defendant and Appellant.

## COUNSEL

Amitai Schwartz, under appointment by the Supreme Court, Elizabeth S. Letcher and Monique Olivier for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Robert R. Anderson, Chief Assistant Attorneys General, Carol Wendelin Pollack, Pamela C. Hamanaka, Assistant Attorneys General, William T. Harter, Susan L. Frierson, Keith H. Borjon and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—A jury convicted defendant Kevin Bernard Haley of the first degree murder of Delores Clement (Pen. Code, § 187)[1] and found true the special circumstance allegations that the murder was committed while defendant was engaged in the commission of burglary (§ 190.2, subd. (a)(17)(G)), robbery (*id.*, subd. (a)(17)(A)), rape (*id.*, subd. (a)(17)(C)), and sodomy (*id.*, subd. (a)(17)(D)). It also convicted defendant of the robbery (§ 211), rape (§ 261, subd. (a)(2)), and sodomy (286, subd. (c)) of Clement, as well as the burglary of her residence (§ 459), but it failed to reach a verdict on charges concerning two other victims. The same jury subsequently set the penalty at death. The trial court denied the automatic motion to modify the penalty (§ 190.4, subd. (e)) and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).)

In *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] (*Carlos*), we held that even when the defendant is the actual killer, intent to kill is an element of the felony-murder special circumstance. While this aspect of *Carlos* was overruled in *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] (*Anderson*), we subsequently held that "[c]ases involving the felony-murder special circumstance committed after *Carlos* but before *Anderson* . . . must apply the intent-to-kill require-ment." (*People v. Wharton* (1991) 53 Cal.3d 522, 586, fn. 16 [280 Cal.Rptr. 631, 809 P.2d 290].) The murder in the present case occurred in the *Carlos/Anderson* "window period." Because the trial court's failure to in-struct the jury on the intent-to-kill requirement was not harmless beyond a reasonable doubt, we affirm the conviction for first degree felony murder and the underlying felonies, but reverse the special circumstance findings and resulting death sentence.

## I. FACTS

### A. *Procedural History*

Following the guilt phase of the jury trial, defendant was convicted of the murder of Delores Clement (§ 187) with the special circumstances that the murder was committed during the commission of burglary, robbery, sodomy, and rape (§ 190.2, subd. (a)(17)). Defendant also was convicted of the burglary of the Clement residence (§ 459) and the robbery (§ 211), sodomy (§ 286, subd. (c)), and rape (§ 261, subd. (a)(2)) of Clement. The jury was

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

unable to reach verdicts on the additional charges that defendant had murdered and sexually assaulted Laverne Stolzy and had sexually assaulted Olga B. The multiple-murder special circumstance (§ 190.2, subd. (a)(3)), which was based on the Clement and Stolzy murders, was therefore not proven. Following the penalty phase, the jury set the penalty at death.

After the trial court denied the automatic motion to modify the penalty (§ 190.4, subd. (e)), it sentenced defendant to death. In addition, the trial court imposed a total determinate term of 11 years based on defendant's convictions for robbery, sodomy, and rape, and ordered that the determinate term run consecutive to defendant's death sentence.

### B. *Guilt Phase Facts*

#### 1. *Delores Clement Murder*

Delores Clement, 55 years old, lived in an apartment building on South Dunsmuir Avenue in Los Angeles. In the late night or early morning hours of September 26 and September 27, 1984, her upstairs neighbor was awakened by a scream. On the morning of September 27, 1984, a second neighbor noticed that the screen was missing from Clement's bedroom window, looked inside, and saw Clement's body. Police officers found Clement's body on top of the bed, facedown. Her nightgown had been pulled up above her chest near her shoulders. There was blood around her head and anal area.

Forensic print specialist William Leo obtained a latent fingerprint and palm print from the inside edge of the doorframe of Clement's closet. Leo testified at trial that he compared those prints to an ink fingerprint card that he had obtained from defendant. Leo stated that the latent prints obtained from the crime scene were defendant's. Criminalist Doreen Music recovered hair samples from the victim's body and right index finger. On October 10, 1984, she compared those hair samples to hair samples obtained from defendant. Music determined that the hair fragment recovered from Clement's right index finger was "similar in microscopic characteristics to the pubic hair samples" obtained from defendant "[a]nd therefore, these items could have a common origin."

On September 29, 1984, defendant was interviewed by Los Angeles Police Department Robbery-Homicide Detective Woodrow Parks at the Wilshire Jail. Defendant denied any involvement in the Clement murder. Detective Parks testified that he was informed on October 9, 1984, that defendant's fingerprints matched the prints recovered at the Clement residence.

He obtained a warrant for defendant's arrest. At approximately 6:30 p.m. on the same date, defendant was arrested at his house on South Brunson Street in Los Angeles. Detective Parks stated that defendant did not appear to be under the influence and was "very cooperative and very talkative."

Defendant was advised that he was under arrest for the murder of Delores Clement. Detective Parks and his partner, Los Angeles Police Department Robbery-Homicide Detective James McCann, told defendant that they knew he had committed the murder because his fingerprints had been found at the crime scene. Defendant replied, "Well, I figured I'd see you again, and you know I did that murder." During the ride to the police station, defendant volunteered that he killed Delores Clement. He added that he was sorry about what had happened because he had just wanted to commit a burglary. He also stated that had not intended to rape Clement, but that he had just gotten excited when he was struggling with her and trying to keep her from screaming.

Once at the police station, defendant made a full confession, which police officers secretly tape-recorded. A portion of this recording was played to the jury. The jury was also provided with a written transcript of this portion of the interview. On the tape recording, defendant stated that he "was just going [into the Clement residence] to get the money." When he heard Clement coming into her bedroom, "[he] couldn't jump out in time so he jumped into the closet." While in the closet, he saw her purse next to her bed and went to retrieve it. Clement started screaming. Defendant stated that he put his hand over her mouth to prevent her from screaming. They struggled "all over the bed," and "[he] was trying to keep her mouth closed with one hand while [he] looked through the purse with the other." He admitted to raping and sodomizing her after he had gone through her purse and retrieved some money.

Defendant admitted that, after he had sex with Clement, he strangled her with his hands while she was lying on her back. When asked whether he strangled her so she would not tell the police, defendant replied, "No— nothing like that. I just wanted . . . to get out." He stated that Clement was "never dead when I was there." He added, "When I left there, she was . . . down and breathing." Defendant stated that he stopped having sex with her when he started "[t]hinking about what I was doing." He added: "I ran . . . I didn't want her to catch her breath and start screaming." Defendant stated that on the day of the murder he had ingested a quarter-gram or less of cocaine a "long time" before the murder occurred. He added that he drank four beers afterwards, which made the effects of the cocaine "linger." He stated that he was "never incoherent" while under the influence of narcotics.

Dr. Susan Selser, a deputy medical examiner in the Los Angeles County Coroner's Office, testified as to the cause of death of Delores Clement, based on an autopsy report prepared by Dr. Terry Allen, formerly of the same office. Dr. Selser stated that she also reviewed Dr. Allen's preliminary hearing testimony in this matter. She testified that the cause of Clement's death was asphyxia due to manual strangulation, to wit, a lack of oxygen due to pressure applied to the neck. She added that the victim had extensive bruises in the neck muscles, a fracture to the hyoid bone, which is a small U-shaped bone at the base of the tongue, a fracture to the thyroid cartilage, which lies just below the hyoid, and petechial hemorrhages along the mucosal surfaces of the larynx. But the victim's thyroid cartilage was fractured in a manner that left it intact, and Dr. Selser stated that she was unable to determine which of the two fractures had impeded the victim's breathing. She testified that there was "probably a partial obstruction" to the victim's breathing passageway and acknowledged that it was "very likely" that manual pressure was removed from the neck, and the obstruction caused insufficient oxygen to reach the brain. She added that there were also extensive lacerations to Clement's anus and vagina caused by blunt force trauma. While the injuries were possibly caused by a penis, she stated that "another type of foreign object would be more likely."

### 2. *Laverne Stolzy Murder*

On the morning of June 26, 1984, Laverne Stolzy's body was found at her home by a coworker. She was 56 years old. Her blouse was pushed up over her breasts and she was naked from the neck down. Police observed a "considerable amount of blood to the top of her hair." There was a piece of wood in the room (commonly referred to as a "two-by-four") that appeared to have blood and hair on it at one end, and a piece of corncob lying on the floor between her feet. Semen was present on the narrow end of the corncob. The pathologist testified that there were extensive fractures to the top, middle, front, and base of Stolzy's skull and the cause of death was multiple cerebral injuries due to blunt force trauma.

Ollie Coleman, a neighbor of Stolzy's, was the prosecution's only eyewitness. On the night of the murder, he was standing outside of his house when he saw defendant walk behind the Stolzy residence. Defendant was back there for "maybe ten minutes or so," so Coleman walked over to "see what was happening with this guy." Coleman passed by defendant and they exchanged greetings. This encounter lasted five seconds. They were "face to face, one or two feet" away from each other. Defendant walked away, but returned shortly thereafter and walked down Stolzy's driveway.

Approximately 30 minutes later, he saw defendant get into Stolzy's car, start it, and attempt to drive off. Coleman testified that he had "no doubt in [his] mind" that defendant was the person he saw the night of the murder.

Detective Parks testified that the day after defendant's arrest, October 10, 1984, he asked defendant to remove his shoes in order to get a footprint. He stated that defendant asked him, "Why are you doing this?" Parks stated that "Detective McCann told him that we had his footprints at the murder scene of the woman that was killed on 23rd Street in June" (the Stolzy murder) and defendant responded, "Well, you better check your evidence on that case because when I did her, I never took my clothes off."

### 3. *Olga B.*

Olga B., 58 years old, was deemed unavailable to testify at trial due to her poor health; her preliminary hearing testimony was thus read to the jury. On August 22, 1984, she was alone in the kitchen of her home on South Spaulding Street in Los Angeles. Her "whole house was lit up." She saw defendant against the wall in her living room and tried to run. Defendant grabbed her from behind, choked her, and put her on a chair in the dining room. Defendant removed her shorts and orally copulated her by placing his tongue into her vagina. He then removed his trousers and tried to rape her. Defendant eventually ejaculated into a towel. He took the money in her purse and fled. The victim identified defendant in a photographic lineup on October 18, 1984, and in court.

Lee Mann, a criminalist with the Los Angeles Police Department, testified that he located a seminal stain on Olga B.'s towel and checked the stain to determine its blood type, which can be classified into three basic blood grouping systems. Mann determined that the person depositing the seminal stain was a type B secretor, and that the seminal fluid was PGM type 1, and PEP-A type 1. Mann concluded that "6 or 7 percent" of the population would exhibit all of the above characteristics, and defendant was in that group.

### C. *Penalty Phase Facts*

#### 1. *Prosecution Case*

At the penalty phase of the trial, the prosecution introduced evidence of four additional crimes allegedly committed by defendant.

##### a. *Barbara A. and Peter Klevecz*

On April 13, 1984, at 12:30 a.m., Barbara A. and Peter Klevecz were at Dockweiler Beach in El Segundo. They were on a date and drinking beer.

She was a virgin. As they were leaving, defendant and his brother, Reginald Haley, asked them for a beer. After Klevecz gave defendant and his brother the beer, one of them pulled out a gun and demanded money. After Klevecz gave them his money, he and Barbara A. were taken to a lifeguard tower and put on separate sides so they could not see each other. Defendant attempted to rape Barbara A. but was unsuccessful. Reginald Haley then tried to rape her, but also was unsuccessful. He then sodomized her. Defendant returned and vaginally penetrated Barbara A. while she was facing downward. Klevecz was held at gunpoint during the sexual attacks.

On October 24, 1985, Barbara A. identified defendant at a live lineup. She also identified him at the preliminary hearing and at trial. Klevecz remembered hearing the name "Regg" spoken by one of the assailants. Barbara A. distinctly remembered that Reginald Haley called defendant "Kev" during her ordeal.

b. *Elizabeth Burns*

On May 21, 1982, police officers discovered the badly beaten body of Elizabeth Burns, age 87. Her robe was pulled up to her midthigh area and wrapped around her. Her false teeth were lying on the floor next to her, and she appeared to have been sexually assaulted. An autopsy revealed that she died from multiple traumatic injuries and suffered severe injuries to the head, as well as injuries to the anus and vagina, consistent with having been raped and sodomized.

David Gerhardt stated that he was a burglar and had known defendant and his brother Regg for seven years. He stated that one time he and the Haley brothers were "riding around in a car" and defendant, pointing out the Burns residence, told Gerhardt that he and his brother had been "casing the place." On a different occasion, he and Reginald Haley went to the residence on foot with the intention of committing a burglary, but Gerhardt withdrew when they discovered an elderly lady was at home. About two weeks later, defendant told Gerhardt that he and his brother had successfully committed that burglary.

Gerhardt was subsequently put in jail, where he saw defendant. Defendant told Gerhardt that he was being charged with "this particular Beverly Hills murder," and Gerhardt said, "You mean the one that you and Reginald did?" Haley replied, "Yeah." Gerhardt responded, "You mean the old lady was there and you did the burglary?" Defendant replied, "Yeah," and indicated that he and his brother killed the lady. It was stipulated, however, that defendant had not been charged with the Burns murder.

### c. *Willa Gerber*

On May 17, 1984, at 5:30 a.m., as part of her usual routine, Willa Gerber went jogging from her house on Whitworth Avenue in Los Angeles toward Beverly Hills. While she was jogging, a dirty maroon 1965 Mustang with a blackish top drove slowly past her. She watched as the car turned around and came back toward her, halting in the middle of the street. Defendant got out of the car holding a gun and told her to "get in the car." He grabbed her and they struggled. Gerber stated that, "He was pulling me and I was battling, and he pushed me down so that my head hit the street, . . . and I mean it cracked my head." While she was lying on the pavement, defendant pointed a gun at her face. She heard a click. She then got up and ran. Defendant followed in the car. Gerber jumped over the picket fence of a house on Stearns Avenue. While she was standing in the yard area, defendant leaned out of the car and fired the gun. She was hit twice. One bullet went into her thigh, through her stomach and out her waist. The second bullet went through her buttocks and lodged in her waist.

### d. *Jodie Samuels*

At 6:45 a.m. on May 17, 1984, approximately one hour after Willa Gerber was shot, Harold Ray was in his house on 23rd Street and Longwood in Los Angeles[2] when he heard someone screaming and realized it was Jodie Samuels, a 15-year-old girl who lived in his neighborhood. Mr. Ray heard her say, "Get away from me, somebody call the cops." He heard a male voice say, "Come back here." As he opened the door to see what was happening, he heard two shots. He saw a Ford Mustang in the street, vintage 1965 or 1964, black or dark gray in color with primer spots. The car, he said, was not maroon. He saw a male getting into the vehicle and described him as a light-complexioned Black man with a longer than average neck, approximately five-foot eight or nine inches tall. He did not identify defendant at a live lineup on October 18, 1984. Looking at defendant in court, he said the man he saw that day "looked a lot lighter than [defendant] in my opinion, lighter in complexion." Jodie Samuels's mother, Dorothy Samuels, stated that she heard gunshots and saw her daughter lying in the street. Her daughter's white purse was missing. Jodie died three days later.

Los Angeles Police Department Robbery-Homicide Detective Fred Miller responded to the location of the Willa Gerber shooting incident and observed the recovery of "a slug, [a] spent round on the ground in the driveway."

---

[2] This location is approximately one block from the Stolzy residence on 23rd Street and Westview Drive.

An expended bullet was also recovered from Jodie Samuels's body during her autopsy. Lawrence Baggett, assigned to the firearms identification unit of the City of Los Angeles, microscopically compared the two expended bullets and concluded that they had been fired from the same gun.

### 2. Defense Case

The sole witness called for the defense at the penalty phase was Kathy Pedzek, an eyewitness identification expert, who explained several factors that can affect the accuracy of eyewitness identifications. Defense counsel did not present any mitigating evidence.

## II. DISCUSSION

### A. Claims Related to Defendant's Statements

Defendant makes three claims related to his statements to police: (1) the initial statements he made to the police following his arrest were involuntary because the police threatened to kill him and his intoxication made him susceptible to that threat; (2) these initial statements were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]; and (3) because his initial statements were obtained in violation of *Miranda*, his subsequent statements, obtained after a valid *Miranda* waiver, were tainted.

■ For the reasons stated below, we hold that defendant's initial statements to police were voluntary and were not the product of an interrogation within the meaning of *Miranda*. As such, defendant's post-*Mirandized* statements, most significantly the statements contained in the subsequent, tape-recorded confession, are admissible. Even assuming arguendo that defendant's initial, voluntary statements to police were obtained in violation of *Miranda*, his tape-recorded confession is still admissible because the subsequent administration of *Miranda* warnings to a suspect who has given voluntary but unwarned statements suffices to remove the conditions that would preclude admission of the earlier statements.

### 1. Background

The admissibility of defendant's statements to the police was litigated prior to trial.[3] The court considered the motion based on the preliminary hearing testimony of Detective McCann, defendant's tape-recorded confession, the

---

[3] The motion to exclude the statements was heard before Judge William Pounders. The jury trial was conducted by Judge Judith Chirlin.

transcript of the tape recording, and defendant's testimony at the hearing. The basis for the motion was that the change in defendant's tone of voice during the recorded interview suggested a "sobering up," which indicated a lack of voluntariness. Defendant never specifically moved to exclude the initial statements he made in the patrol car.

Detective McCann stated in his preliminary hearing testimony that he contacted defendant in jail after defendant was arrested on September 28, 1984, on an unrelated burglary charge. After waiving his constitutional rights, defendant denied any involvement in the Clement murder. He was subsequently released from custody.

On October 9, 1984, a latent print technician informed Detective McCann that defendant's fingerprints matched latent prints that had been located inside Clement's apartment. After securing a warrant for defendant's arrest, McCann, accompanied by his partner, Detective Parks, and a uniformed officer, arrested defendant inside his house and placed him in the rear seat of the detectives' police vehicle. Defendant stated, "I knew I'd see you again," and in response, Detective McCann stated, "Yeah, now we know that you did kill Delores Clement." Defendant paused for a moment and said, "You're right. I did it."[4] Detective McCann then obtained defendant's consent to search his room. He also informed defendant that he and his partner would interview defendant further at the police station.

While en route to the police station, defendant continued to talk about the Clement murder. When it appeared that defendant was beginning an "ongoing narrative," Detective McCann advised defendant of his *Miranda* rights, which defendant waived. Detective McCann stated that defendant "kept stressing the fact he went over to the Clement residence to commit a burglary, that it had not been his intent to commit a murder." Defendant added that he had not intended to commit a rape. Instead, defendant stated that he had concealed himself in the victim's bedroom closet, the victim entered and they struggled; defendant became excited during the struggle and raped Clement. Detective McCann informed defendant that the detectives would conduct a detailed interview at the police station.

Once at the station, the detectives secretly recorded their interview with defendant. On the tape recording, he was again advised of his constitutional

---

[4] The sequence of this conversation is disputed by defendant. At trial, Detective Parks stated that as defendant was put in the backseat of the patrol vehicle, he was advised that he was under arrest for the murder of Delores Clement and that the detectives knew he committed the murder. Defendant replied, "Well, I figured I'd see you again, and you know that I did that murder." Detective Parks added that Detective McCann told defendant that his fingerprint was found at the murder scene. It is unclear precisely when Detective McCann conveyed the fingerprint information to defendant.

rights and he agreed to talk to the detectives.[5] After receiving this waiver, Detective McCann asked, "Do you wish to give up the right to speak with an attorney and to have him present during questioning? Can you sit and talk to me right now and answer my questions without having an attorney present?" Defendant replied, "Yes, I could. But—you know how I feel, but I'm gonna do it *** 'cause *** I don't—I don't want to get jumped on ***." Detective McCann responded, "Well, Kevin, nobody's gonna jump on you. I want to ask you these questions . . . [a]nd if you want to talk to me about it, that's fine. I'm not gonna jump on you. I'm not gonna let anyone else jump on you." Defendant replied: "*** gonna tell you everything, whether *** want it there or not, I just ***." The detective replied, "Okay." Defendant then provided a detailed account of his involvement in the Clement murder.

Defendant testified during the hearing to show, according to defense counsel, defendant's "state of mind at the time just before the [first] statement was made and during the [tape-recorded] statement that he was under the influence of cocaine."

Defendant stated that he was smoking cocaine with his girlfriend in his room shortly before he was arrested and it made him "paranoid and light in the head." He explained that he "came down" during the interview and "wasn't at all in [his] best mind at the time." He stated that Detective McCann had threatened him at his house, slammed him down on his bed and said "he was going to shoot [him] on the way to the police station." On cross-examination, defendant stated that he received his constitutional rights in the police car because he reminded the officers to do so. He agreed that he waived his constitutional rights at the police station. He agreed that no cocaine paraphernalia was found in his room. He told the court that only after he confessed to the Clement murder did he state that he wanted to talk to an attorney. On redirect examination, he stated that he was not as under the influence at the police station as he had been in the house. But then he agreed that he was still under the influence when he admitted killing Clement.

---

[5] As reported in the transcript (*** indicates the recording was unintelligible), Detective McCann told defendant, "I'm gonna give you your Rights again. Remember when I gave them to you on the way over here?" Defendant replied in the affirmative. McCann stated: "But *** give 'em to you again. You have the right to remain silent. If you give up the right to remain silent, anything you say can and will be used against you in a court of law. You have the right to speak with an attorney and to have the attorney present during questioning. If you so desire and cannot afford one, an attorney will be appointed for you without charge before questioning. You understand all that?" Defendant: "Yeah." McCann: "Okay. You understand each of these rights—I've explained them to you?" Defendant: "Yes, I do." McCann: "*** do you wish to give up the right to remain silent? Do you want to talk to me; do you want to answer my questions—" Defendant: "Yes." McCann: "—tonight? Okay."

The trial court denied the motion to exclude defendant's statements, ruling that the bulk of the tape-recorded statement was admissible. The court, however, did suppress statements made by defendant later in the tape-recorded statement, after he confessed to the Clement murder. Specifically, the court ruled that the detectives persisted in questioning defendant about the Stolzy murder after he had invoked his right to remain silent. The court also ruled that defendant's reference to being "jumped on" was not "indicative of a threat [but that defendant did not] want the [officers'] criticism," and that defendant's change in demeanor, which it noticed from listening to the tape recording, was not the result of "coming down off of the cocaine use." Instead, the court found that it is "equally and perhaps more persuasive he is upset about having given the details of a very gory murder to the police, and that seems to cause his reluctance to talk further."

## 2. Voluntariness

Defendant argues that his tape-recorded confession at the police station was involuntary "because McCann had threatened to kill him and because he was under the influence of cocaine." This claim is based solely on defendant's testimony at the hearing, in which he alleged that Detective McCann threatened to kill him on the way to the police station and that he had smoked cocaine shortly before his arrest.

"[T]he state's burden is to prove the voluntariness of a confession by a preponderance of the evidence." (*People v. Weaver* (2001) 26 Cal.4th 876, 920 [111 Cal.Rptr.2d 2, 29 P.3d 103].)[6] "Under both state and federal law, courts apply a 'totality of circumstances' test to determine the voluntariness of a confession. [Citations.] Among the factors to be considered are ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' [Citation.] On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review." (*People v. Massie* (1999) 19 Cal.4th 550, 576 [79 Cal.Rptr.2d 816, 967 P.2d 29].)

The trial court's determination that defendant's tape-recorded confession was voluntary is supported by substantial evidence. The trial court had the

---

[6] Defendant argues that where a confession "proves the case," voluntariness must be proved beyond a reasonable doubt. However, defendant cites no authority in support of this proposition. Under both the federal and state Constitutions, the prosecution must prove the voluntariness of a confession by a preponderance of the evidence. (*Lego v. Twomey* (1972) 404 U.S. 477, 489 [30 L.Ed.2d 618, 92 S.Ct. 619]; *People v. Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042].)

opportunity to observe defendant testify and judge his credibility. Despite defendant's claim that he smoked cocaine shortly before his arrest, no cocaine paraphernalia was found in his room. In addition, the tape recording reveals that defendant was responsive to the officer's questioning, recalled the incident in great detail, and never mentioned during the interview that he was under the influence or otherwise mentally impaired. These factors support the trial court's finding that defendant was not "under the influence of any narcotic or dangerous drug," and that his change in demeanor was "attributable solely to the fact" that he had just provided the police with details of "a very gory murder."

Nor did the trial court credit defendant's testimony that Detective McCann threatened to kill him when he was arrested. Certainly, defendant's credibility was in question given that his testimony about smoking cocaine in his room shortly before his arrest was impeached by the fact no cocaine paraphernalia was found there. Instead, the court credited the preliminary hearing transcript testimony of Detective McCann, who described defendant as very eager to talk on the way to the police station. Detective McCann's testimony is corroborated by the fact that defendant was cooperative during the portion of the tape-recorded interview in which the Clement murder was discussed. These factors support the trial court's finding that defendant's statement in the tape-recorded confession that he did not want to be "jumped on" indicated only that he did not want to be criticized by the officers. Under the totality of the circumstances, we agree with the trial court that defendant's tape-recorded confession was voluntary.

### 3. *Miranda Waivers Were Knowing, Voluntary, and Intelligent*

Defendant makes the related claim that the *Miranda* waivers he gave both in the patrol car and prior to his taped-recorded confession at the police station were not made knowingly, voluntarily, and intelligently. This claim, too, is based on defendant's insistence that his statements to police were a product of Detective McCann's threat to kill him. "In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under [*Miranda*], we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence." (*People v. Wash* (1993) 6 Cal.4th 215, 235 [24 Cal.Rptr.2d 421, 861 P.2d 1107].) As discussed above, the trial court chose not to credit defendant's testimony that the officers threatened to kill him upon his arrest, and thus found that defendant's initial statements in the patrol car, and those contained in the *Mirandized* tape-recorded confession, were voluntary. The trial court's ruling is supported by substantial evidence.

### 4. No Interrogation Occurred

■ Defendant next claims that the detectives violated his *Miranda* rights when they "interrogated" him (1) at the police car immediately after his arrest, and (2) while en route to the police station. But defendant never made this specific claim at the trial court level. As such, he has failed to preserve it for review. (See, e.g., *People v. Memro* (1995) 11 Cal.4th 786, 833 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) Even assuming that these claims were properly preserved, we reject them.

#### a. Statements at the patrol car

Defendant argues that Detective McCann's statement to him at the patrol car just after his arrest, that the detectives "knew" he committed the Clement murder because they found his fingerprints at the scene of the crime, constituted an interrogation because it was reasonably likely to elicit an incriminating response.[7]

■ A defendant who is in custody, as here, must be given *Miranda* warnings before police officers may interrogate him. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 297 [64 L.Ed.2d 297, 100 S.Ct. 1682] (*Innis*).) In *Innis*, the high court defined the term "interrogation," stating that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (*Innis*, 446 U.S. at pp. 300–302, fns. omitted.)

---

[7] It is unclear whether Detective McCann told defendant about the fingerprint evidence before defendant stated, "You're right. I did it." (See discussion, *ante*, p. 296, fn. 4.) We will assume for purposes of analysis, however, that the officer conveyed this information to defendant prior to defendant's admission.

In *Innis*, while the defendant was being transported to the police station, one police officer said to another that he hoped police would continue searching for the missing gun because a student from the school for the handicapped could pick it up and get hurt. (*Innis, supra*, 446 U.S. at pp. 294–295.) The defendant then volunteered the weapon's location. The court ruled that this brief conversation was not an interrogation because it was "nothing more than a dialogue between the two officers to which no response from respondent was invited." (*Id.* at p. 302.)

In *People v. Clark* (1993) 5 Cal.4th 950 [22 Cal.Rptr.2d 689, 857 P.2d 1099], the defendant was being transported to the hospital by the police to obtain a blood sample. He had previously invoked his *Miranda* rights. He asked the officers what the penalty was for the murder for which he was under arrest, stating: " 'What can someone get for something like this, thirty years?' " (*Id.* at p. 982.) The officer responded that he had never seen anyone serve more than seven and a half years unless the person was a " 'mass murderer.' " Following this exchange, the defendant confessed. (*Ibid.*) We held that this conversation did not constitute an interrogation: "Clearly, not all conversation between an officer and a suspect constitutes interrogation. The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response." (*Id.* at p. 985.) We concluded: "The record does not establish that defendant was subject to 'compelling influences, psychological ploys, or direct questioning.' [Citation.]" (*Id.* at p. 986.)

In *People v. Dominick* (1982) 182 Cal.App.3d 1174 [227 Cal.Rptr. 849] (*Dominick*), defendant Shedelbower invoked his right to an attorney. As the investigators began picking up their notebooks and other materials in preparation to leave the interview room and take the defendant to the booking area, a detective falsely stated to the defendant that the stabbing victim had identified the defendant's picture as one of the persons who had raped her and murdered her friend. The detective truthfully added that a codefendant was in custody. Five minutes later, the defendant confessed. (*Id.* at p. 1189.) The Court of Appeal held that these statements were not an interrogation within the meaning of *Innis*, stating, "the officers did not attempt to engage defendant in a conversation but merely offered him justification for retaining him in custody. Their words do not appear to us to be 'reasonably likely to elicit an incriminating response from the suspect.' " (*Dominick*, at p. 1192.)

In *U.S. v. Shedelbower* (9th Cir. 1989) 885 F.2d 570, the Court of Appeals upheld the state court's ruling in *Dominick, supra*, 182 Cal.App.3d 1174. Relying on *Innis*, the court ruled that the detective's statements that the victim identified the defendant's picture and that a codefendant was in custody "were not the functional equivalent of questioning. They did not call

for nor elicit an incriminating response. They were not the type of comments that would encourage [the defendant] to make some spontaneous incriminating remark." (*Shedelbower, supra,* 885 F.2d at p. 573.)

In *United States v. Moreno-Flores* (9th Cir. 1994) 33 F.3d 1164, upon the defendant's arrest, the officer told him that they "had seized about 600 pounds of cocaine," that he "was in serious trouble," and "was facing a lengthy prison sentence." (*Id.* at p. 1168.) The defendant did not respond. The following morning, after the officer asked him "how his night was," the defendant confessed. (*Ibid.*) The court of appeals, relying on *Innis,* held that the officer's statements on the previous night were not express questions, "[n]or did they constitute the functional equivalent of interrogation." (*Moreno-Flores,* at p. 1169.)

■ These cases are fatal to defendant's argument. Detective McCann told defendant, in effect, that "he knew he did it because his fingerprint was found at the scene." The detective did not phrase this statement as a question, and this statement did not call for an incriminating response. A brief statement informing an in-custody defendant about the evidence that is against him is not the functional equivalent of interrogation because it is not the type of statement likely to elicit an incriminating response.

*People v. Sims* (1993) 5 Cal.4th 405 [20 Cal.Rptr.2d 537, 853 P.2d 992], relied upon by defendant, is inapposite. There, the defendant was in custody in Las Vegas, Nevada, for murders committed in South Carolina and Glendale, California. Two Glendale officers asked the defendant if he wanted to talk about the case, and the defendant invoked his right to counsel. As the officers were leaving, the defendant asked what was going to happen to him, referring to whether he would be extradited to South Carolina or California. One officer then told the defendant that he was wanted for murder in both California and South Carolina and launched into a detailed explanation about the defendant's involvement in the Glendale crime, providing the defendant with a detailed account of the evidence against him. We stated that the officer's detailed, nonresponsive answer to the defendant's extradition question was the " 'functional equivalent' " of questioning because he "pursued a line of conversation far exceeding the scope of any answer legitimately responsive to a question concerning extradition." (*Id.* at p. 442.) Similarly, in *People v. Boyer* (1989) 48 Cal.3d 247, 274 [256 Cal.Rptr. 96, 768 P.2d 610], we found an *Innis* violation where the officer, after the defendant invoked his *Miranda* rights to silence and counsel, asked the defendant to reenter an interrogation room and "launched into a monologue on the status of the investigation," which prompted an incriminating response from the defendant. Such is decidedly not the situation here. Detective McCann made a brief statement to defendant that did not call for an incriminating response, and the record here, unlike in *Sims*

and *Boyer*, does not establish that defendant was subject to compelling influences, psychological ploys, or direct questioning.

### b. *Statements en route to the police station*

While en route to the police station, defendant was "very eager" to talk about the Clement murder and made incriminating statements. When it appeared that defendant was beginning an "ongoing narrative," Detective McCann advised defendant of his *Miranda* rights, which defendant waived.

In *People v. Ray* (1996) 13 Cal.4th 313, 337 [52 Cal.Rptr.2d 296, 914 P.2d 846], we stated that "not all statements obtained by the police from a suspect who is incarcerated or otherwise confined are the product of interrogation. Nothing in *Miranda* is intended to prevent, impede, or discourage a guilty person, even one already confined, from freely admitting his crimes, whether the confession relates to matters for which he is already in police custody or to some other offense. As *Miranda* itself recognized, '[c]onfessions [are] a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment' or subject to the prophylactic requirements of *Miranda*. [Citations.]"

Defendant's statements en route to the police station were volunteered. As noted, the court credited the preliminary hearing transcript testimony of Detective McCann, who described defendant as very eager to talk on the way to the police station. This finding is supported by substantial evidence. Accordingly, there was no interrogation and no *Miranda* violation occurred.

### 5. *The Subsequent Advisement Was Valid*

Defendant also claims that his initial statements when he was arrested and while en route to the police station, because they were obtained illegally, tainted his tape-recorded statement at the police station that was obtained after he was advised of and waived his *Miranda* rights. We disagree. As noted, defendant's initial statements were not the product of an interrogation within the meaning of *Miranda*. Even assuming his initial statements were

obtained in violation of *Miranda,* we conclude that because they were voluntarily given, they did not taint defendant's subsequent tape-recorded confession.

In *Oregon v. Elstad* (1985) 470 U.S. 298 [84 L.Ed.2d 222, 105 S.Ct. 1285], the high court rejected the notion that a subsequent confession must necessarily be excluded because it followed an otherwise voluntary statement that was given without *Miranda* warnings. The court stated: "It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether is it knowingly and voluntarily made." (470 U.S. at p. 309.)

■ In *Elstad,* an officer had come to the defendant's home to arrest him. Without providing the required *Miranda* advisement, the officer asked the defendant if he knew why the officer was there and if he knew the burglary victims. The defendant's response was incriminating. The defendant later gave a full statement at the police station after having been advised of and having waived his *Miranda* rights. The high court held that despite the officer's initial failure to administer warnings to the defendant, the defendant's statement at the station need not be suppressed: "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." (*Oregon v. Elstad, supra,* 470 U.S. at p. 314.) *Elstad* compels the same conclusion here.

### B. *Excusal of Four Prospective Jurors*

Defendant claims that the trial judge improperly granted the prosecutor's motion to excuse four prospective jurors for cause because there was no showing that their views concerning capital punishment would prevent or substantially impair their performance as jurors. In addition, on October 16, 1993, it was established that the questionnaires completed by these four jurors could not be located. Defendant claims that the absence of these juror questionnaires denies him a meaningful level of appellate review because it cannot be determined from reviewing only the record transcript whether the jurors' ability to serve was substantially impaired. We conclude that the

missing juror questionnaires do not impede meaningful appellate review, and that the trial judge properly excused the four prospective jurors for cause.

### 1. *Lost Juror Questionnaires*

Both the United States Constitution and the California Constitution entitle a criminal defendant to a record on appeal sufficiently complete to permit meaningful appellate review. (*People v. Howard* (1996) 1 Cal.4th 1132, 1165 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) In *People v. Ayala* (2000) 24 Cal.4th 243, 270 [99 Cal.Rptr.2d 532, 6 P.3d 193] (*Ayala*), and *People v. Alvarez* (1996) 14 Cal.4th 155, 196, footnote 8 [58 Cal.Rptr.2d 385, 926 P.2d 365] (*Alvarez*), we held that lost juror questionnaires did not impede meaningful appellate review: "The record on appeal is inadequate . . . only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal. [Citation.] It is the defendant's burden to show prejudice of this sort. [Citation.] Defendant attempts to carry this burden, but does not succeed. He simply does not show that the absence of the questionnaires is prejudicial to his ability to urge his *Wheeler/Batson* claim—or any other. Indeed, material from the now lost items survives in the reporter's and clerk's transcripts through quotation and paraphrase." (*Alvarez, supra*, 14 Cal.4th at p. 196, fn. 8.) In *Ayala*, we explained that despite the absence of the juror questionnaires the record was sufficiently complete to decide defendant's *Wheeler* claims. (*Ayala*, 24 Cal.4th at p. 270; see *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.)

We reach the same conclusion here. The complete transcript of the voir dire process is available for appellate review. The record reveals that during voir dire, the trial judge permitted both attorneys considerable latitude in exploring each juror's views on the death penalty. The attorneys were free to read questions on a prospective juror's questionnaire and the prospective juror's written response, and then ask the prospective juror to further explain his or her written response. Thus, portions of the juror questionnaires have been preserved for appellate review through quotation and paraphrase.

The voir dire transcript in the present case reveals that each of the challenged jurors gave equivocal or conflicting statements as to whether they could impose the death penalty. This alone is a sufficient basis to uphold the determination of the trial court as to these jurors' actual state of mind. (*People v. Carpenter* (1997) 15 Cal.4th 312, 357 [63 Cal.Rptr.2d 1, 935 P.2d 708] (*Carpenter*) ["if the juror's statements [regarding the death penalty] are equivocal or conflicting, the trial court's determination of the juror's state of mind is binding"].) Defendant fails to show prejudice because he does not

explain *how* the missing juror questionnaires undermine this fact. We therefore conclude that the absence of the juror questionnaires does not impede meaningful appellate review in this case.[8]

### 2. *The Prospective Jurors Were Properly Excused*

A trial judge may properly exclude a prospective juror in a capital case if the juror's views on capital punishment would prevent or substantially impair the performance of his or her duties as a juror in accordance with the court's instructions and the juror's oath. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844]; *People v. Jones* (2003) 29 Cal.4th 1229, 1246 [131 Cal.Rptr.2d 468, 64 P.3d 762]; *People v. Guzman* (1988) 45 Cal.3d 915, 955 [248 Cal.Rptr. 467, 755 P.2d 917].) The determination of a juror's qualifications falls " 'within the wide discretion of the trial court, seldom disturbed on appeal.' " (*People v. Kaurish* (1990) 52 Cal.3d 648, 675 [276 Cal.Rptr. 788, 802 P.2d 278].) There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1035 [90 Cal.Rptr.2d 607, 988 P.2d 531].) Instead, "it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror." (*People v. Jones, supra*, 29 Cal.4th at pp. 1246–1247.) "On review, if the juror's statements [regarding the death penalty] are equivocal or conflicting, the trial court's determination of the juror's state of mind is binding. If there is no inconsistency, we will uphold the court's ruling if it is supported by substantial evidence." (*Carpenter, supra*, 15 Cal.4th at p. 357.)

### a. *Juror Marvela P.*

Prospective Juror Marvela P. made conflicting statements about her views on the death penalty. Therefore, the trial court's determination as to this juror's state of mind is binding.

Initially, Marvela P. agreed with defense counsel that she would listen to the evidence, and if the prosecution proved defendant's guilt as well as the special circumstances beyond a reasonable doubt, she would not hesitate or refuse to vote for guilt or find true the special circumstances allegations to avoid considering whether a death sentence would be appropriate. But she acknowledged her opposition to the death penalty in this manner: "It seems like murder, that man shouldn't take life, only the Lord." She agreed that it was "really God's function to take lives, not ours." When asked by the

---

[8] Nothing in our discussion should be interpreted as condoning the loss of juror questionnaires in capital murder cases. (Cal. Rules of Court, rule 34.1(a)(1)(C); *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1088 [86 Cal.Rptr.2d 602, 979 P.2d 963].)

prosecutor what she thought about the death penalty, she said, "I don't think it [*sic*] should be a death penalty. I don't really think it [*sic*] should be a death penalty." When asked to explain this belief, Marvela P. stated, "It should be the Lord that take[s] a life, you know, not us." The prosecutor pointed out, contrary to her earlier answer to defense counsel, that Marvela P. stated in her juror questionnaire that she would refuse to vote for murder in the first degree because she would not want to consider the death penalty. The prosecutor then asked, "You don't believe in the death penalty; that's clear?" Marvela P. replied, "Yes." The prosecutor stated, "And that's just something you don't want to deal with; is that right?" Marvela P. replied, "Yes."

Based on her inconsistent answers and the fact that she stated "that man shouldn't take a life," the trial judge found that Marvela P. "would be substantially impaired in terms of her ability to vote for the death penalty." The trial judge properly excused Prospective Juror Marvela P. (See, e.g., *Ayala*, *supra*, 24 Cal.4th at p. 275 ["we are bound by the trial court's determination that [the juror was] substantially impaired" where the juror gave inconsistent answers, including testimony that she was incapable of imposing death penalty].)

b. *Juror Delores T.*

Prospective Juror Delores T. acknowledged that her statements about the death penalty were contradictory: "I know I have contradicted myself. I realize that." The judge first asked Delores T. whether she had "such strong feelings about the death penalty that under no circumstances, no matter what . . . evidence there is, just no way that you could vote for the death penalty," to which she responded, "at this point in time, I'd have to say yes." Yet later, Delores T. said she could conceive of a situation in which she would vote for the death penalty, such as if something happened to her five-year-old son. Delores T. also agreed with the defense attorney that she would listen to the evidence, and based on the evidence and the law, would "follow [her] convictions." The prosecutor began his questioning of Delores T. by referring her to the following question on her juror question-naire: "Do you have such an opinion concerning the death penalty that regardless of the evidence that might be revealed during the penalty phase of the trial, should we get there, you would automatically and absolutely refuse to vote for the death penalty in any case?" Delores T. stated that her written response was "yes," and that "those were my feelings at the time and basically that remains my feelings."

At a sidebar conference after this questioning, the trial judge stated that Delores T.'s ability to serve as a juror was "substantially impaired" and therefore granted the prosecutor's challenge for cause. Based on her admitted inability to impose the death penalty, the trial court properly excused

Prospective Juror Delores T. (See, e.g., *People v. Maury* (2003) 30 Cal.4th 342, 379 [133 Cal.Rptr.2d 561, 68 P.3d 1] [prospective juror properly excused where she "did not think" she could impose the death penalty].)

### c. *Juror Betty L.*

During voir dire, the defense attorney aptly described Prospective Juror Betty L.'s statements when he stated to the judge, "she sort of flips back and forth." Betty L. initially agreed with the trial judge that "if . . . the prosecutor has proved beyond a reasonable doubt that the defendant is guilty, and he has proved beyond a reasonable doubt that the special circumstances are true, that [she] would not hesitate or refuse to vote for those verdicts that [she] thought were correct . . . ." Betty L. seemingly confirmed that she could vote for the death penalty in response to various questions by the defense attorney. But when the prosecutor asked, "But under the right circumstances, do you think you could [impose the death penalty]," Betty L. responded, "I really don't think so. I don't." The prosecutor then stated: "Then you should not be on this jury because you, yourself, could not impose the death penalty?" Betty L. responded, "Right."

During a sidebar conference, the defense attorney appropriately character-ized Betty L.'s testimony when he said, "the state of the record is somewhat ambiguous as to whether she is substantially impaired." Based on this ambiguity, the judge properly excused Prospective Juror Betty L. (See, e.g., *People v. Jones, supra,* 29 Cal.4th at pp. 1248–1249 [prospective juror properly excused based on equivocal statements].)

### d. *Juror Margaret S.*

The trial judge first asked Margaret S., "Do you have such opinions about the death penalty that you could just not, under any circumstances and regardless of what the evidence is, you just could not vote to impose the death penalty?" Margaret S. responded, "I believe that's so." To confirm, the judge rephrased his question, "You think that your feeling about the death penalty is, you just couldn't . . ."; Margaret S. interrupted, "No, it's against my nature." Later, however, Margaret S. stated that she might be able to impose the death penalty in certain situations, but she could not articulate such situations. Answering questions from the prosecutor, Margaret S. charac-terized the death penalty and the notion of "an eye for an eye," as "a barbaric cultural practice." Margaret S. also reiterated her opposition to the "concept" of the death penalty. Based on her conflicting statements, the trial judge properly excused Prospective Juror Margaret S.

### C. *Carlos Error*

Defendant claims that the felony-murder special-circumstances findings and resulting death sentence must be reversed because the trial court failed to instruct the jury that it must find that defendant intended to kill the victim as required by our decision in *Carlos, supra,* 35 Cal.3d 131. We agree.

In *Carlos,* we held that intent to kill was a required element of the felony-murder special circumstance, whether the defendant was the actual killer or an aider and abettor. (*Carlos, supra,* 35 Cal.3d at pp. 153–154.) In *Anderson, supra,* 43 Cal.3d 1104, we partially overruled *Carlos* and held that intent to kill is not an element of the felony-murder special circumstance when the defendant is the actual killer; "but when the defendant is an aider and abetter rather than the actual killer, intent must be proved before the trier of fact can find the special circumstance to be true." (*Anderson,* at p. 1139.) *Anderson* was silent on whether its holding applied retroactively. (*In re Baert* (1988) 205 Cal.App.3d 514 [252 Cal.Rptr. 418].) Defendant committed the Clement murder in September 1984, during the "window period" between the decisions in *Carlos* and *Anderson.* Moreover, the trial took place in the spring of 1988, after the *Anderson* decision but before an appellate court had ruled on whether the decision in *Anderson* applied retroactively.

Against this backdrop, the issue of *Anderson's* retroactivity was fiercely litigated by the parties. During voir dire, defense counsel requested that the trial court pose questions to the prospective jurors on the intent-to-kill issue, but the court refused. After the jury was sworn, the parties submitted briefs on the *Carlos* issue. Defense counsel argued that if *Carlos* did not apply, "the real legal effect is to prevent the defendant from putting before the jury a defense that he did not have the intent to kill." The trial judge "reluctantly" applied *Anderson* retroactively.

However, prior to the beginning of the defense case, the trial judge revisited the *Carlos* issue. Stating that she had not "changed [her] mind" that *Anderson* applied retroactively, she nonetheless asked the prosecutor whether he still objected to a *Carlos* intent-to-kill instruction, given that several judges had informed her "that other district attorneys have taken the position [that] they don't want to risk anything, and so they're willing to accede to a defense request on [the *Carlos*] instruction." The prosecutor replied that while "it is possible that maybe we can do it by the way of a special finding . . . I'll just rely on my understanding of the law that it is retroactive, and let the appellate courts decide the issue . . . ." The court warned that doing so was "a big risk," but the prosecutor did not waver. As he stated, "the only thing that is at risk is the special circumstance rather than the case, so I am prepared to go

forward." The trial court therefore left intact its ruling that defendant would not be permitted to present evidence on the issue of intent to kill because it was "irrelevant."

Defense counsel immediately sought review of the trial court's *Carlos* ruling by filing a petition for writ of prohibition in the Court of Appeal, which was summarily denied.[9] This court denied review. Accordingly, the jury was not instructed that defendant must have intended to kill Delores Clement in order to be convicted of the felony-murder special circumstance.

This was error. While *"Anderson* has since been applied to appellants convicted of pre-*Carlos* felony murder" *(People v. Whitt* (1990) 51 Cal.3d 620, 638 [274 Cal.Rptr. 252, 798 P.2d 849]), "[c]ases involving the felony-murder special circumstance committed after *Carlos* but before *Anderson . . .* must apply the intent-to-kill requirement. [Citation.]" *(People v. Wharton, supra,* 53 Cal.3d at p. 586, fn. 16.) As noted, this murder occurred in the *Carlos/Anderson* window period. Both parties concede that *Carlos* error occurred. They differ as to whether the failure to instruct the jury on the intent-to-kill requirement mandates reversal of the special circumstance findings and the judgment of death in this case. It does.

The determination of whether *Carlos* error is harmless "depends on application of the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]." *(People v. Osband* (1996) 13 Cal.4th 622, 681 [55 Cal.Rptr.2d 26, 919 P.2d 640] *(Osband).)* In other words, "error in failing to instruct that a special circumstance contains a requirement of the intent to kill is harmless when 'the evidence of defendant's intent to kill . . . was overwhelming, and the jury could have had no reasonable doubt on that matter.' " *(Ibid.)*

Certainly, if the jury had considered whether defendant intended to kill Clement and returned a finding of guilt, that verdict would have been supported by substantial evidence. (See, e.g., *People v. Hernandez* (1988) 47 Cal.3d 315, 349 [253 Cal.Rptr. 199, 763 P.2d 1289] [strangulation "is indicative of at least a deliberate intent to kill"].) But the evidence that defendant intended to kill Clement was not overwhelming. Rather, the jury might have believed defendant's claim that he did not intend to kill the victim and that she was alive when he fled the scene of the crime.

Defendant admitted strangling Clement, but asserted that she had interrupted him while he was committing a burglary and he strangled her only to

---

[9] Because the Court of Appeal summarily denied writ relief, its ruling does not constitute law of the case. *(Kowis v. Howard* (1992) 3 Cal.4th 888, 897–901 [12 Cal.Rptr.2d 728, 838 P.2d 250].)

prevent her from screaming. He denied having strangled her so she would not report his crimes to the police, adding he just wanted "to get out." He told the police he used a pillow "not to suffocate her, just to wipe off her face." Defendant claimed the victim was alive when he left her, stating: "[S]he was just trying to—like, catching her breath away. . . . [S]he was down and breathing." Defendant added, "I ran—I had to run back out before she—you know—I didn't want her to catch her breath and start screaming. I just took off right after that 'cause she was just—when I went in there, she was just gasping for air."

Defendant's initial statements to detectives after his arrest are consistent with his recorded statements. On cross-examination, Detective Parks agreed that, in the police vehicle, defendant stated he just went in to commit a burglary, that he had no intention to hurt anyone, and he just wanted to sneak in, take some money and sneak out again. Detective Parks added that defendant told detectives that "he was sorry."

The autopsy report is also consistent with defendant's version of events. The report listed the cause of death as asphyxia due to manual strangulation, to wit, a lack of oxygen due to pressure applied to the neck. The report supported its conclusion as to the cause of death by pointing to fractures to the victim's hyoid bone and thyroid cartilage. But the victim's thyroid cartilage was fractured in a manner that left it intact, and the medical examiner was unable to determine which of the two fractures impeded the victim's breathing. Rather, the medical examiner testified that there was "probably a partial obstruction" to the victim's breathing passageway, and acknowledged that it was "very likely" that manual pressure was removed from the neck, and the obstruction caused insufficient oxygen to reach the brain.

In *People v. Marshall* (1997) 15 Cal.4th 1 [61 Cal.Rptr.2d 84, 931 P.2d 262] (*Marshall*), we reversed a felony-murder special-circumstance finding based upon *Carlos* error on similar facts, holding that the evidence presented did not show beyond a reasonable doubt that the defendant intended to kill the victim. We stated: "The pathologist . . . testified (based on the report of another physician who had actually done the autopsy and on photographs taken by others at the crime scene and the autopsy) that the cause of [the victim's] death was asphyxia caused by a combination of a ligature gag and compression of the neck. On cross-examination, [the pathologist] stated that it was possible for a person to die from a ligature gag alone and that small bones in the neck that are often broken during manual strangulation were not fractured in [the victim's] neck. From this evidence the jury could reasonably have found that defendant gagged [the victim] to quiet her screams for help, without an intent to kill her, and that [the victim] choked to death on her gag." (*Marshall*, 15 Cal.4th at p. 43.)

■ The evidence in the present case could support a finding that defendant intended to kill the victim, but it also is consistent with defendant's claim that he was merely attempting to silence the victim's screams. Accordingly, the evidence of intent to kill is not overwhelming and the trial court's error in failing to instruct the jury that it must find intent to kill in order to find true the felony-murder special circumstance was prejudicial. The cases in which we have concluded that *Carlos* error was harmless are far different from the present case. (See, e.g., *People v. Bolden* (2002) 29 Cal.4th 515, 560–561 [127 Cal.Rptr.2d 802, 58 P.3d 931] [single five-to-six-inch-deep stab wound to back of apparently sleeping and helpless victim]; *Osband, supra,* 13 Cal.4th at pp. 681–682 [severe beating and deep stab wound in the neck of elderly victim that severed carotid artery]; *People v. Cudjo* (1993) 6 Cal.4th 585, 630 [25 Cal.Rptr.2d 390, 863 P.2d 635] [multiple blows to back and sides of head on helpless victim, fracturing the skull and lacerating the brain]; *People v. Johnson* (1993) 6 Cal.4th 1, 46–47 [23 Cal.Rptr.2d 593, 859 P.2d 673] [one victim strangled to death with telephone wire and set afire; second victim beaten to death by being kicked 10–12 times in the face and head].)

## D. *Refusal to Instruct on Involuntary Manslaughter*

Defendant claims that the trial judge's failure to instruct the jury on involuntary manslaughter as a lesser included offense of first degree felony murder, constitutes reversible error.[10] We conclude that the trial judge properly denied defendant's request to give an involuntary manslaughter instruction. We further conclude that even if the judge should have given such an instruction, the failure to do so constitutes harmless error.

■ "[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence [and] . . . an erroneous failure to instruct on a lesser included offense constitutes a denial of that right . . . ." (*People v. Lewis* (2001) 25 Cal.4th 610, 645 [106 Cal.Rptr.2d 629, 22 P.3d 392].) However, a trial judge need not instruct the jury as to all lesser included offenses, just those that find substantial support in the evidence. (*People v. Ochoa* (1998) 19 Cal.4th 353, 422 [79 Cal.Rptr.2d 408, 966 P.2d 442].) " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

[10] Defendant requested CALJIC No. 8.47 (5th ed. 1988), which provides: "If you find that a defendant, while unconscious as a result of voluntary intoxication, killed another human being without intent to kill and without malice aforethought, the crime is involuntary manslaughter. [¶] When a person voluntarily induces [his] [her] own intoxication to the point of unconsciousness, [he] [she] assumes the risk that while unconscious [he] [she] will commit acts inherently dangerous to human life or safety. Under such circumstances, the law implies criminal negligence."

■ With these principles in mind, we turn to involuntary manslaughter. "When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter." (*People v. Ochoa, supra,* 19 Cal.4th at p. 423.) Unconsciousness does not mean that the actor lies still and unresponsive. Instead, a person is deemed "unconscious" if he or she committed the act without being conscious thereof. (*Id.* at pp. 423–424.)

In the present case, defendant argues that the trial judge should have instructed the jury as to the elements of involuntary manslaughter, because defendant presented "substantial evidence" that he was "unconscious" when he murdered the victim. Specifically, defendant claimed in the tape-recorded interview that he ingested cocaine and drank alcohol the night he murdered the victim. Defendant also claimed in the interview that while he was raping the victim, he started thinking about what he was doing and stopped before he ejaculated.

No rational jury could have found defendant guilty of involuntary manslaughter based on this evidence. First, during the tape-recorded confession, defendant never claimed that his cocaine use rendered him "unconscious," or otherwise made him unaware of what he was doing. To the contrary, defendant admitted that when he smokes cocaine, he is "never incoherent." Moreover, defendant was able to recount in great detail his actions on the night of the murder; these details reveal that defendant was not only conscious, but calculating, alert and methodical. For example, defendant described how he entered the victim's house by removing a screen, then climbing through the open window. After entering, defendant searched for the victim's purse without being detected by the victim, who was in the house. When the victim entered the bedroom, defendant hid in the closet because he calculated that he could not exit through the window in time. Once the victim noticed defendant and began screaming, he had the presence of mind to keep one hand over her mouth to silence her while he looked through her purse with his other hand. He removed money from the victim's purse, and was able to recall the approximate amount of money as well as the denominations. Defendant was able to draw a diagram of the location of the victim's house, and explain his movements once inside the house. Defendant even described the victim in detail, down to the "pink," "light color" of her "pajamas."

■ The fact that defendant was able to describe the crimes in such detail, as well as act in a cold, calculating manner during the crimes, clearly shows that no reasonable jury could have found defendant guilty of involuntary manslaughter. (See *People v. Ochoa, supra,* 19 Cal.4th 353, 424.) The trial judge properly declined to instruct the jury on involuntary manslaughter.

Even assuming that the trial court should have given the involuntary manslaughter instruction, any such error was harmless because the jury's guilty verdicts as to burglary and robbery compel the conclusion that the jury rejected defendant's argument that he was intoxicated to the point that he was unaware of his acts. Specifically, the jury had been instructed that voluntary intoxication could negate the specific intent required for robbery and burglary. In returning its burglary and robbery verdicts, therefore, the jury necessarily rejected defendant's argument that his alleged intoxication affected his ability to commit the crimes. "[I]n view of the actual verdict returned by the jury . . . there is no reasonable or plausible basis for finding that the instructional error affected the jury's verdict." (*People v. Flood* (1998) 18 Cal.4th 470, 505 [76 Cal.Rptr.2d 180, 957 P.2d 869].)

### E. *Rape and Sodomy Instructional Errors*

 Defendant was charged with first degree felony murder, based on the theory that he murdered Delores Clement during the commission of four different felonies: robbery, burglary, rape, and sodomy. In explaining the elements of these four underlying felonies to the jury, the trial court stated that the crimes of rape and sodomy were general intent crimes. But to be convicted of felony murder, a defendant must have the specific intent to commit one of the enumerated felonies, even if the enumerated felony is a general intent crime, such as rape or sodomy. (See, e.g., *People v. Hernandez, supra,* 47 Cal.3d at p. 346.) In such situations, the prosecution must prove beyond a reasonable doubt that the defendant harbored the specific intent to commit rape or sodomy. (*Id.* at p. 346, fn. 20.) However, the jury was not so instructed. The Attorney General concedes that this was error. Defendant argues the instructional error was prejudicial because there was insufficient evidence of his specific intent to commit rape and sodomy.[11]

In *People v. Flood, supra,* 18 Cal.4th 470, 504, we held that a "trial court's instructional error is amenable to harmless error analysis [when] it appears beyond a reasonable doubt that the error did not contribute to this jury's verdict." We are convinced beyond a reasonable doubt that the error here did not contribute to the jury's verdict. Defendant admitted raping and sodomizing Delores Clement after he had gone through her purse and retrieved some money. The coroner added that Clement had extensive lacerations to her anus and vagina caused by blunt force trauma. Defendant's statement that he had not intended to rape Clement, but "just got excited when he was holding onto her trying to keep her from screaming" suggests he had not planned to rape Clement, not that the rape was unintentional.

---

[11] In part F, we conclude the trial court erred when it instructed the jury it could find defendant guilty of first degree felony murder using sodomy as the predicate offense, but find this error harmless. That discussion subsumes defendant's claim of instructional error here with respect to sodomy and, therefore, we confine our analysis to rape.

In addition, we have found felony-murder instructional error to be harmless where we could "determine from the record that the jury necessarily found defendant guilty on a proper theory." (*Marshall, supra,* 15 Cal.4th at p. 38.) In *Marshall,* defendant contended that his felony-murder conviction had to be reversed because it may have been based on an improper felony-murder theory (robbery rather than rape). We disagreed and stated: "The jury found true the special circumstance allegation that defendant killed [the victim] during the attempted commission of a rape. Because a jury must unanimously agree that a special circumstance finding is true (§ 190.4), and the jury in this case was so instructed, the jury's finding that defendant killed [the victim] in the course of committing an attempted rape indicates that the jury unanimously found defendant guilty of first degree murder on the valid theory that the killing occurred during the attempted commission of a rape." (*Marshall, supra,* 15 Cal.4th at p. 38.)

In the present case, the jury necessarily and unanimously found defendant guilty of first degree murder on a proper felony-murder theory. Specifically, the jury was correctly instructed that defendant must have had the specific intent to commit robbery or burglary in order to be found guilty of first degree felony murder,[12] and it found true the felony-murder special circumstance that defendant killed the victim during the course of a robbery and burglary. The jury was also instructed that it must decide each special circumstance separately, which "indicates that the jury unanimously found defendant guilty of first degree murder on the valid theory that the killing occurred during the . . . commission of a [robbery or burglary]." (*Marshall, supra,* 15 Cal.4th at p. 38.)

### F. *First Degree Felony Murder Based on Sodomy*

Defendant correctly contends, and the Attorney General concedes, that the trial court erroneously instructed the jury that it could find defendant guilty of first degree felony murder based on the predicate felony of sodomy. In September 1984, when defendant murdered Delores Clement, "section 189

---

[12] With respect to first degree felony murder, the judge gave the following instruction: "In order to prove the commission of the crime of murder in this case, each of the following elements must be proved: One, that a human being was killed; Two, that the killing was unlawful and; Three, that the killing occurred during the commission or attempt to commit a felony inherently dangerous to human life. Robbery, burglary, rape and sodomy are felonies inherently dangerous to human life. [¶] The unlawful killing of a human being, whether intentionally, unintentional or accidental which occurs as a result of the commission or attempt to commit the crimes of robbery and burglary and where there was in the mind of the perpetrator, the specific intent to commit such a crime, is murder in the first degree. [¶] The specific intent to commit robbery or burglary in the commission or attempt to commit such crimes must be proved beyond a reasonable doubt. [¶] The unlawful killing of a human being, whether or not intentional or accidental, which occurs as a result of the commission of or attempt to commit the crimes of rape or sodomy, is murder in the first degree."

limited the types of sex offenses that would support a conviction of *first degree felony murder* to rape (§ 261) and lewd or lascivious acts with a child under the age of 14 years (§ 288). Although murder committed in the course of a sodomy was a special circumstance which, if found true, would support imposition of the death penalty, a jury at the time could consider the sodomy special circumstance only after finding defendant guilty of having committed first degree murder." (*People v. Hart* (1999) 20 Cal.4th 546, 580, fn. 2 [85 Cal.Rptr.2d 132, 976 P.2d 683].)

This error was harmless. As noted above, *Marshall* teaches that if the trial court erroneously instructs on felony murder, reversal is not required if there is a basis in the record to conclude that the verdict was based on a valid theory of guilt. (*Marshall, supra*, 15 Cal. 4th at p. 38.) In the present case, the jury was correctly instructed that defendant must have had the specific intent to commit robbery or burglary in order to be found guilty of first degree felony murder, and it found true the felony-murder special circumstance that defendant killed the victim during the course of a robbery and burglary. The jury was instructed that it must decide each special circumstance separately, which indicates that the jury unanimously found defendant guilty of first degree murder on the valid theory that the killing occurred during the commission of a robbery or burglary.

### G. *Inconsistent and Confusing Instructions*

Defendant contends that the trial court erred by giving confusing, conflicting and erroneous instructions to the jury with respect to the specific intent requirements of robbery and burglary felony murder. The trial judge's instructions to the jury in this regard were the following: "In the crimes of murder, burglary and robbery . . . a necessary element is the existence in the mind of the defendant of the specific intent as included in the definitions of the crimes." After a brief sidebar conference, the judge said to the jury, "Now, the specific intent, there is a specific intent required with respect to burglary or robbery. The reason the murder count is included in this instruction, is that what the instruction means is basically that in order for you to find the felony murder based upon either—on the burglary or the robbery, you must find the specific intent that is required for the burglary or the robbery. Unless you find those specific intents for the burglary or the robbery, you cannot find the defendant guilty of felony murder based on that burglary or robbery." The judge then proceeded to read the standard jury instructions for first degree felony murder, robbery and burglary.

Defendant asserts that these instructions were erroneous and confusing because the felony-murder rule requires that a defendant must have the specific intent to commit one of the enumerated *felonies* (e.g., *People v.*

*Hernandez, supra*, 47 Cal.3d at p. 346), which means that the defendant must harbor specific intent to commit every element of burglary or robbery, not just the specific intent to steal. The trial judge should have stated, defendant asserts, that the prosecutor needed to prove defendant specifically intended to commit every element of the burglary and robbery, as opposed to stating generally that the specific intent requirement for felony murder is "the specific intent as included in the definitions of the crimes."

Not so. We rejected this precise argument in *People v. Pollock* (2004) 32 Cal.4th 1153, 1175 [13 Cal.Rptr.3d 34, 89 P.3d 353], stating: "Defendant argues that a specific intent to commit the underlying felony means a specific intent to commit the crime as a whole or . . . to commit each element of the underlying felony, and not merely the specific intent, if any, that is required for the commission of the underlying felony. [¶] Defendant is mistaken, at least as to underlying felonies that are specific intent crimes. For felony murder in the commission of a robbery or of a burglary in which entry is made for the purpose of theft, the only specific intent that the prosecution must prove is the specific intent to steal the victim's property, which includes a specific intent to permanently deprive the victim of the property. [Citation.] A defendant who has this specific intent has the only specific intent required for liability under the felony-murder rule." (See also *People v. Visciotti* (1992) 2 Cal.4th 1, 56 [5 Cal.Rptr.2d 495, 825 P.2d 388] [stating that intent to steal is the only mental state relevant to felony murder in the commission of robbery].)

The trial judge's instructions, therefore, were neither erroneous nor confusing in this regard. Further, the clarification after the sidebar conference appropriately reminded the jury that in order to convict defendant of felony murder, it must find that he had the requisite specific intent required for either robbery or burglary. The judge then properly listed the specific intent requirements for those crimes. Thus, the jury deliberated and reached a verdict with the proper understanding of the specific intent requirements.

### H. *Reversal Due to Cumulative Instructional Errors*

Defendant next contends that his convictions should be reversed because even assuming that no single error was prejudicial, the errors considered in total add up to a degree of prejudice requiring reversal. However, because none of the instructional errors in fact prejudiced defendant, his argument for cumulative prejudice must fail.

### III. DISPOSITION

We affirm defendant's convictions for first degree murder, robbery, burglary, rape, and sodomy. The felony-murder special-circumstance findings are set aside, and the judgment of death is reversed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.