Filed 11/29/22 P. v. Flint CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> BRYAN DARYL FLINT, <br><br> Defendant and Appellant. | F081072 <br><br> (Super. Ct. No. BF178933A) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. Brian M. McNamara, Judge.

Jake Stebner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, Kari Mueller and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# **INTRODUCTION**

Defendant Bryan Daryl Flint threw George Smetana into a closet door after he found Smetana asleep in bed with the woman with whom defendant was in an intimate relationship. Defendant then continued hitting Smetana while telling Smetana he was going to kill him. Smetana believed defendant would kill him and was afraid for his life.

A jury convicted defendant of residential burglary, battery causing serious bodily injury, and criminal threats in connection with the incident.

On appeal, defendant claims the trial court committed reversible error by not instructing the jury sua sponte on the lesser included offense of attempted criminal threats. Defendant also asks this court to independently review the in camera *Pitchess*[1] proceedings to determine whether the proper procedures were followed and whether the trial court abused its discretion in not releasing additional information from part of the officer's personnel file. In supplemental briefing, defendant requests the matter be remanded to the trial court for it to exercise its discretion in sentencing as to which term should be stayed under Penal Code[2] section 654, as amended by Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518). Additionally, defendant requests the matter be remanded for resentencing under Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567).

We remand for the court to hold a resentencing hearing to exercise its newfound discretion pursuant to Assembly Bill 518 and to consider the sentencing requirements under Senate Bill 567. In all other respects, we affirm the judgment.

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

[2] Further undesignated statutory references are to the Penal Code, unless otherwise indicated.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

#### A. *Jennifer Garzelli*

Garzelli testified defendant was her boyfriend between August and November 2019. Their relationship was good unless defendant got drunk; then, he would become angry and possessive. One evening in August 2019, Garzelli and defendant got a motel room together. Garzelli gave an older man and his wife $5 to help them pay for their motel room, which caused defendant to become angry at Garzelli. Garzelli told defendant she was going to leave because he was really intoxicated, but defendant put Garzelli in a headlock, or chokehold, until she could not breathe. Garzelli lost consciousness and fell to her knees. When she regained consciousness, she felt her body convulsing like she was having a seizure; she heard defendant telling her to breathe. Garzelli reported the incident to the police and defendant was arrested that night. Defendant called Garzelli from jail and told her he blacked out and did not know what he had done to her. The district attorney's office filed charges against defendant, but Garzelli did not go to court when she was subpoenaed because defendant told her "no face, no case."

While defendant was in jail, Garzelli had a sexual relationship with George Smetana. Garzelli described the relationship as more of a friendship rather than a committed relationship. Garzelli talked with Smetana about her relationship with defendant and told defendant about her relationship with Smetana.

On November 4, 2019, defendant called Garzelli and told her he had been released from jail. He was at a bus station in downtown Bakersfield; Garzelli agreed to pick him up. Smetana was with Garzelli when she received the call from defendant, and she told Smetana she was going to pick up defendant. Garzelli testified she did not care about Smetana's reaction because he "was company and everything had changed knowing that [defendant] was home." She left Smetana at her residence and went to pick up defendant.

3.

Garzelli spoke with defendant about their relationship and they decided they were going to fix things. Defendant did not "blame" her or "judge [her] for anything that happened," but said Smetana just needed to go now. Garzelli loved defendant and was comfortable ending things with Smetana. Garzelli wanted to drop defendant off and then take Smetana home, but defendant did not want to leave Garzelli and insisted on staying with her. Defendant agreed not to touch Smetana; he just wanted to stay with Garzelli while she took Smetana home.

When Garzelli got to her residence, she left defendant in her vehicle and went in to speak with Smetana to explain to him what was going on. Smetana was emotional and cried. Smetana got into the backseat of the truck, behind Garzelli. Defendant told Smetana that he was home now and that whatever Smetana had with Garzelli was over. Smetana was sad and crying.

After taking Smetana home, Garzelli and defendant returned to Garzelli's residence where they talked about getting married. The next day, defendant gave Garzelli a ring. Garzelli's family did not approve of her relationship with defendant, so even though she wanted to marry defendant, she felt it was wrong. While Garzelli was with defendant, Garzelli received a phone call from her mother who was upset because Smetana told her Garzelli was back with defendant. Garzelli felt guilty because she knew she should not be with defendant. Garzelli left defendant and went home by herself to discuss the situation with her family.

On her way home, Smetana called Garzelli and they met to talk. Smetana had a huge dagger with him that looked like a sword. Smetana was emotionally falling apart, but Garzelli was irritated because she did not have the same feelings for him. Garzelli brought Smetana back to her residence because he refused to get out of her truck. Smetana left the dagger in Garzelli's truck. Garzelli and Smetana sat in bed watching a movie and smoking pot. Garzelli had also been drinking.

4.

Garzelli and defendant began communicating through Facebook Messenger. Garzelli told defendant she wished she was next to him, and defendant said he wanted to come over. Garzelli told defendant he could not be on the property because of her family. Defendant said he was going to come in through the window around midnight like a ninja. Garzelli told him not to and it was not a good idea. Garzelli did not tell defendant Smetana was with her. She was nervous defendant would come over while Smetana was there, and she was also worried her family would call the cops on defendant if he showed up. Defendant said, "Don't lock the back door. I'm on my way." Garzelli responded, "Don't come here." Garzelli testified "[e]verything was locked except for my bathroom window." Defendant told Garzelli "I'm getting a Lyft over. On my way." But Garzelli had already fallen asleep. Garzelli did not think defendant would show up because their conversation had been going on for about two hours and he had not shown up. Garzelli was asleep in bed with Smetana, who had fallen asleep right next to her.

Garzelli woke up to Smetana screaming. Defendant put Smetana in a headlock, then picked up Smetana by his shirt and threw him into Garzelli's closet door, which broke. Garzelli got in between defendant and Smetana and told defendant to let Smetana go. Smetana ran out the back door and defendant ran after Smetana. Garzelli called her mother and told her defendant was there and she needed to call 911. When defendant returned to her place, Garzelli noticed defendant had blood all over him. Garzelli asked where Smetana was and defendant said he just beat him up. Garzelli asked if Smetana was alive and defendant responded that Smetana was dead. Garzelli said just tell me he is alive, and defendant responded he would be lucky if he was. As a result, Garzelli believed Smetana was dead.

Garzelli's stepbrother, Mikal Guerrero, came around the corner with a baseball bat and confronted defendant about why he was there. Guerrero left after Garzelli asked him to leave; she did not want anyone else to get hurt. Garzelli noticed defendant had a knife in his hand and a knife visible on the side of his shorts. Garzelli and defendant ended up

5.

in the bathroom and Garzelli gave defendant his ring back. When they came out of the bathroom, defendant grabbed Garzelli, put her in a headlock, and told her not to move. She did not move because she was scared and knew defendant was under the influence. Plus, Garzelli's kids were there and she did not want anything to happen in front of them. Defendant grabbed Garzelli's wrists in a way that was slow and taunting. Defendant cut her twice. When defendant cut her left wrist he said, "This one's for [Smetana], and this is just a reminder of what I can do to your neck." Garzelli was really scared and told defendant, if he was going to kill her, not to do it where her kids would find her. Garzelli told defendant she had called the cops. Defendant said he knew the cops were coming and he needed to get his paperwork and stuff out of her truck. She told defendant she would get his things but she wanted him to get off the property. When Garzelli walked out to the street, she saw the cops.

Garzelli saw Smetana the next morning at the hospital. His head was wrapped up and he was covered in blood. Smetana was unrecognizable. Half of his head was swollen and looked deformed.

### B. George Smetana

Smetana testified Garzelli was his friend and they started dating around the time of the incident. Smetana knew what defendant had done to Garzelli at the motel when she lost consciousness. On November 4, 2019, Smetana was with Garzelli when she got a call from defendant. She was going to pick defendant up from the bus station; Smetana asked her not to go. Smetana testified he cared for Garzelli and was afraid for her safety. Smetana waited at her house. Garzelli called Smetana and he told her to take him home. When Garzelli picked Smetana up, defendant was in the truck. Smetana felt uncomfortable and scared seeing defendant in the truck because of what defendant had done to Garzelli. While driving Smetana home, Garzelli kept telling defendant to leave Smetana alone, not to talk to Smetana, and not to touch him. Garzelli told Smetana to

6.

shut up, which he felt she did to keep him safe. Smetana said defendant was acting aggressive in the truck; asking Smetana who he was and where he stayed. Smetana cried because Garzelli picked up defendant after what he did to her which he believed was not right.

The next day, Garzelli picked up Smetana and took him to her residence. Smetana had a knife on him because he was scared of defendant; he had no idea what defendant was capable of. Smetana left the knife in the truck when they got to Garzelli's residence. While there, they hung out, watched television, and smoked marijuana. Garzelli was on her phone texting, but Smetana was not aware Garzelli was texting defendant. He was also not aware defendant said he was coming over to Garzelli's place that night.

Smetana fell asleep and was awoken by defendant standing above him. Defendant grabbed Smetana, put him in a chokehold, and then threw him against the closet door, breaking it. Smetana testified he was 130-something pounds and could not throw defendant around. Smetana was scared and did not know how defendant got into the residence because everything was locked.

Garzelli got in between them and yelled for Smetana to run, so he ran out the back door. Smetana ran through a back gate and towards the street. He stopped because he realized he did not have any shoes on or any of his possessions. He heard someone coming and turned around to see defendant. Defendant looked angry and approached Smetana in an aggressive manner, with his hands up and threatening. Defendant swung at Smetana first and hit him in the face. Smetana tried to defend himself by taking a swing, but defendant forcibly held him down and beat him. Defendant held Smetana on the ground by his knees sitting on top of Smetana's chest while continuing to beat him. Defendant had Smetana's arms pinned so Smetana was not able to fight back. Smetana begged defendant to stop, but defendant kept screaming he was going to kill Smetana. Smetana believed defendant was going to kill him because defendant was holding him down and beating him. Smetana screamed for help, but nobody responded.

7.

Smetana managed to get up and run when defendant was about to kick him. Smetana was unsure if defendant kicked him, but felt it was possible because he was hit before running away. Smetana was scared he was going to die and was in "more or less fight, flight, or, you know, survival, and I ran."

Smetana ran north as fast as he could until he found a place to hide. At that time, Smetana started losing his vision; he started banging on people's doors and flagging down cars for help. Someone eventually helped Smetana and told him the cops were looking for him. After his adrenaline calmed down, Smetana started to feel pain. His face throbbed. He had pain in his toe and ribs. Smetana had blood in his eyes, which were so swollen he could not see. Smetana stayed in the hospital overnight. Smetana suffered bruises and a broken nose. He received stitches above his right eye and his head was so swollen he could not put on his hat for about a week or two. Smetana stated he needed surgery to fix his nose but could not afford it and it is still broken. Smetana testified he was in pain for about four or five days after the incident and was in bed for about a week. Smetana ended up going back to the hospital because he was dizzy and started falling and was scared he would die. Smetana requested a restraining order against defendant because he was terrified about what happened to him. He testified that he still feels scared about it.

### C. *Mikal Guerrero*

Garzelli's stepbrother Guerrero lived at the front of the same residence she did at the time of the incident. While lying in bed, Guerrero heard some noises coming from outside and a male yelling "faggot." Guerrero got up to look outside and heard noises coming from the front; primarily a male's voice yelling "help." Guerrero opened his front door, leaving his security screen door closed, and saw what he described as a scuffle between two males. Guerrero could hear the sounds of somebody hitting or kicking somebody. At this point, Guerrero opened his screen door and yelled "Hey," but they

8.

kept going. It was dark outside and his view out his front door was about 80 percent obstructed by a large bush or tree. Guerrero could see one male straddled on top of another male, hitting the male on the bottom. When they did not stop, Guerrero went back inside. After about five to six more minutes, Guerrero saw defendant enter the driveway. Guerrero recognized defendant as the male that was on top hitting the person on the bottom. Guerrero testified that he saw the other male lying on the floor.

Guerrero grabbed a bat for protection and went outside. Guerrero then heard his stepsister, Garzelli, talking with someone. Guerrero asked if everything was okay or if there was a problem. Garzelli appeared frightened. Guerrero recognized the male talking with Garzelli was the same one beating the other person earlier. He did not want to pursue things any further, so he left and called 911.

Guerrero got in his car and went looking for Smetana and found him sitting on the sidewalk. Smetana was disorientated, looked hurt, and had a lot of blood on his shirt. Guerrero told law enforcement where Smetana was located.

### D.     Dr. Alex Huang

Dr. Alex Huang was the resident physician on duty in the emergency department when Smetana arrived on November 6, 2019. He testified that Smetana had "several contusions, which [are] bruises, of his scalp and face, which is seen as just swelling of the soft tissue on a CT scan. He also had a small subdural hematoma, which is basically a small collection of blood inside the brain, on the scan. That shows as a hyperdense region on the scan." Dr. Huang further testified that "basically, he had a lot of bruises on his face and on his skin—the skin over his head on the CT scan, and he also had a small bleed inside his brain that we saw on the scan as well. The bleed was basically inside his skull, and there were also injuries that were outside the skull." Smetana also had a broken nose.

9.

Dr. Huang agreed being punched in the face could cause bleeding on the brain and that a person could die from that type of brain bleed. He also agreed that Smetana's other injuries were consistent with someone being punched in the face with fists multiple times. After consulting with the trauma team, the physicians decided it was protocol to observe Smetana for six to eight hours. After observation, Smetana was discharged since he did not "have any neurological deficits or any worsening of his condition."

### E.   *Deputy Bradly Brandon*

Deputy Bradly Brandon was assigned to investigate the incident with Deputy Vidal Contreras. Deputy Brandon conducted follow-up interviews with Garzelli and Smetana after the incident. Garzelli and Smetana were scared and concerned for their safety, and they both wanted emergency protective orders. Later, when Deputy Brandon went to Garzelli's residence to give her copies of the emergency protective order, Garzelli asked if he wanted to see the knives. Deputy Brandon thought the knives had already been collected, but Garzelli told the deputies she still had them, so the knives were seized at that time. Deputy Brandon did not notice any blood on the knives.

Deputy Brandon conducted a recorded interview with defendant at the jail. Portions of the interview were played for the jury.

## II.   Defense Evidence

### A.   *Defendant Bryan Flint*

Defendant testified he was dating Garzelli and had asked her to marry him. After defendant was released from jail on November 4, 2019, Garzelli picked him up in her truck. Then, they went to Garzelli's house to get Smetana and tell him he needed to go. Defendant was in the front passenger side of the truck and Smetana sat in the back seat behind Garzelli. Defendant described it as awkward but stated he was not mad. Defendant claimed Smetana was timid during the ride but was not crying.

10.

When defendant and Garzelli were at Garzelli's place, defendant cut the top of his left wrist, and Garzelli cut her own wrist, and they sucked each other's blood.

The next day, defendant put his grandfather's mason ring on Garzelli's finger "as a promise to get her her own ring." Garzelli went home but said she would return later to pick up defendant; defendant was going to go to her residence and stay the night. When Garzelli did not return, defendant contacted her. Garzelli told defendant not to come over, but defendant wanted to see her and decided to get a Lyft to Garzelli's residence. Defendant did not know Smetana was there. When defendant got to Garzelli's place, he went in through the back door, which was unlocked. Defendant testified he felt deceived and lied to when he saw Garzelli and Smetana in bed together. He became very irritated and frustrated and was angry at both Garzelli and Smetana.

Defendant woke up Smetana by tapping him gently on the cheek telling him to wake up. Smetana woke up and screamed when he saw defendant. Smetana "went into [defendant's] chest with his head," and defendant cradled Smetana there while he talked with Garzelli. Defendant then picked Smetana up by his shirt and threw him out of the bed. Smetana hit the closet door and then ran out the back door. Defendant stayed and kept talking with Garzelli telling her how disappointed he was with her and how much he loved her. Defendant said he was calm and they talked for about 30 seconds to a minute. Then, defendant left and told Garzelli he never wanted to see her again.

Defendant explained he intended to go home, but he saw Smetana walking back towards him. Defendant stated he did not intend on fighting Smetana, but Smetana's fists were clenched like he was ready to fight. Defendant testified Smetana swung first. Defendant dodged two swings from Smetana before he punched Smetana in the face. Smetana went in low at defendant's sternum and tried to wrestle defendant, but defendant tossed him over to the left side of the road. Smetana came back at him again, and defendant hit him a couple of times. Defendant testified he only kept hitting Smetana because Smetana kept coming at him. Smetana became dazed and went down, but did

11.

not lose consciousness. Defendant could tell Smetana was no longer trying to fight back. Smetana was down on one knee, holding onto defendant's leg, so defendant helped Smetana up. Defendant stated he probably punched Smetana about 10 times. He stated he only used force on Smetana because Smetana swung at him first and defendant was defending himself. Defendant was not scared of Smetana and stated Smetana may have hit him in the midsection but never in the face. Defendant denied yelling the word "faggot," and denied telling Smetana he was going to kill him. Defendant denied he wanted to kill Smetana.

Defendant left and went back to Garzelli's place to get his ring. Defendant said he did not go inside Garzelli's residence; he waited outside on the back porch. Defendant denied telling Garzelli Smetana was probably dead. Defendant denied cutting Garzelli's wrists with a knife that night.

Defendant admitted he had been involved with fight clubs in the past where he learned how to fight. Defendant had been in five fights as part of this club and stated that he won each fight. Defendant stated he had no memory of the evening at the motel where he placed Garzelli in a headlock. Defendant claimed he did not do it from what he remembered. Defendant admitted on cross-examination that he can be aggressive and that it is hard for him to walk away from things, especially when he feels disrespected. He asserted Smetana lied about what happened and that Garzelli was lying "about everything."

### B. Darla Thomas

Darla Thomas is defendant's mother. Thomas testified she saw Garzelli and defendant at her house the day after her son was released from custody and they looked happy together. Thomas asked Garzelli about some cuts or scratches she saw on Garzelli's arm, and Garzelli explained she had cut herself when she was stressed.

## III.    Verdict and Sentencing

The jury found defendant guilty of residential burglary in the first degree (§ 460, subd. (a); count 2), battery with infliction of serious bodily injury upon Smetana (§ 243, subd. (d); count 4), and criminal threats (§ 422; count 6).

The jury found defendant not guilty of attempted murder of Smetana (§§ 664/187, subd. (a); count 1), and not guilty of inflicting corporal injury on a spouse or cohabitant (§ 273.5, subd. (a); count 5). Since the jury was deadlocked on count 3, assault upon Garzelli by the use of a deadly weapon (§ 245, subd. (a)(1)), the court declared a mistrial as to that count.

The court imposed a total sentence of seven years in state prison consisting of the upper term of six years on count 2, plus one year (one-third the midterm) on count 4, to be served consecutive to count 2. The court also imposed the upper term of three years on count 6, which was stayed pursuant to section 654. The court granted the People's motion to dismiss count 3.

## DISCUSSION

## I.    The Trial Court Did Not Commit Reversible Error by Not Instructing the Jury Sua Sponte on Attempted Criminal Threats as an Alternative and Lesser Included Offense

Defendant contends the trial court had a sua sponte duty to instruct the jury on the lesser included offense of attempted criminal threats. And because the trial court did not instruct the jury on attempted criminal threats, defendant asserts the trial court committed reversible error. The People disagree contending the evidence did not compel the trial court to instruct sua sponte on the lesser included offense of attempted criminal threats.

### A.    Relevant Factual and Procedural History

Regarding the charged offense of criminal threats, the jury was instructed with CALCRIM No. 1300: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to George Smetana; [¶] 2. The defendant made the threat orally;

13.

[¶] 3. The defendant intended that his statement be understood as a threat and intended that it be communicated to George Smetana; [¶] 4. The threat was so clear, immediate, unconditional, and specific that it communicated to George Smetana a serious intention and the immediate prospect that the threat would be carried out; [¶] 5. The threat actually caused George Smetana to be in sustained fear for his own safety; AND [¶] 6. George Smetana's fear was reasonable under the circumstances."

Additionally, the jury was instructed: "Someone commits an act *willfully* when he or she does it willingly or on purpose. [¶] In deciding whether a threat was sufficiently clear, immediate, unconditional, and specific, consider the words themselves, as well as the surrounding circumstances [¶] Someone who intends that a statement be understood as a threat does not have to actually intend to carry out the threatened act. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor harm. It is an injury that is greater than moderate harm. [¶] *Sustained fear* means fear for a period of time that is more than momentary, fleeting, or transitory. [¶] An immediate ability to carry out the threat is not required." (CALCRIM No. 1300.)

### B.    *Applicable Law and Standard of Review*

The appellate court may review any instruction given, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby. (§ 1259.) Even absent a request, the trial court has a duty to give an instruction " 'where the circumstances of the case so dictate.' " *People v. Riel* (2000) 22 Cal.4th 1153, 1199, quoting *People v. Carrera* (1989) 49 Cal.3d 291, 311, fn. 8; § 1259.)

"The trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 29 (*Brothers*); see *People v. Birks* (1998) 19 Cal.4th

14.

108, 118 (*Birks*) ["California decisions have held for decades that even absent a request, and even over the parties' objections, the trial court must instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser"]; see also *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*) ["a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence"]; *People v. Lewis* (2001) 25 Cal.4th 610, 645 ["[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence [and] … an erroneous failure to instruct on a lesser included offense constitutes a denial of that right."]; *People v. Lopez* (1998) 19 Cal.4th 282, 288.)

"On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*Breverman*, *supra*, 19 Cal.4th at p. 162; *People v. Ochoa* (1998) 19 Cal.4th 353, 422 [a trial judge need only instruct the jury as to all lesser included offenses " 'which find substantial support in the evidence.' "].) "Substantial evidence" in this context is evidence from which a jury composed of reasonable persons could conclude that the lesser offense, but not the greater, was committed. (*People v. Haley* (2004) 34 Cal.4th 283, 312, quoting *Breverman*, at p. 162; *People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8 [evidence is substantial if "a reasonable jury could find [it] persuasive"].) "[S]ubstantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself" and "even when as a matter of trial tactics a defendant … fails to request the instruction." (*Breverman*, at pp. 154, 162–163.) "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." (*People v. Wilson* (1967) 66 Cal.2d 749, 763.)

"An appellate court applies the independent or de novo standard of review to the failure by a trial court to instruct on an uncharged offense that was assertedly lesser than, and included, in a charged offense. Whether or not to give any particular instruction in

any particular case entails the resolution of a mixed question of law and fact that, we believe, is however predominantly legal. As such, it should be examined without deference." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) " ' "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." ' " (*People v. Steskal* (2021) 11 Cal.5th 332, 345.)

The elements of the completed crime of a criminal threat requires proof the defendant: (1) willfully threatened to commit a crime that will result in death or great bodily injury to another person; (2) with the specific intent that the statement be taken as a threat; (3) the threat was on its face and under the circumstances "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat"; (4) the threat actually caused the victim "to be in sustained fear for his or her own safety or for his or her immediate family's safety"; and (5) the victim's fear was reasonable under the circumstances. (§ 422; CALCRIM No. 1300.)

An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done towards its commission." (§ 21a; CALCRIM No. 460.) An attempted criminal threat is a lesser included offense of a criminal threat offense. (*People v. Toledo* (2001) 26 Cal.4th 221, 230–232 (*Toledo*); *In re Sylvester C.* (2006) 137 Cal.App.4th 601, 607, 609 ["attempt is a lesser included offense of any completed crime"].)

### C. Analysis

Defendant claims the trial court committed reversible error by not instructing the jury on the alternate or lesser included offense of attempted criminal threats. Defendant concedes he did not ask the trial court to instruct the jury on attempted criminal threats but asserts his claim is not forfeited because the trial court had a sua sponte duty to instruct the jury on lesser included offenses. Defendant claims "the evidence presented was 'substantial enough to merit consideration by the jury' that the crime committed was

16.

no more than an attempt." Defendant reasons that a jury could reasonably conclude the prosecution failed to prove beyond a reasonable doubt that defendant's threat actually caused Smetana to be in sustained fear of defendant because Smetana was already fearful of defendant before the incident. Defendant argues, before he ever threatened to kill Smetana, defendant's mere presence placed Smetana in perpetual fear. Defendant notes Smetana was scared of him since Smetana encountered him in Garzelli's car. Defendant argues Smetana was so fearful of him Smetana began "arming himself with a dagger." Defendant asserts the prosecution "failed to elicit any testimony to allow jurors to distinguish the impact, if any, of [defendant's] alleged criminal threat on Mr. Smetana's preexisting fear …." The People disagree and contend Smetana's preexisting fear of defendant only bolsters Smetana's testimony he believed defendant's threat to kill him. Accordingly, the People claim the trial court did not have a sua sponte duty to instruct the jury on attempted criminal threats. Regardless, the People contend that even if the court had a sua sponte duty to so instruct, any error was harmless.

Because an attempted criminal threat is a lesser included offense of a criminal threat (see *Toledo*, *supra*, 26 Cal.4th at pp. 230–232; *In re Sylvester C.*, *supra*, 137 Cal.App.4th at p. 607), the trial court would have had a duty to instruct the jury sua sponte on the lesser included offense of attempted criminal threats if there was substantial evidence from which a jury could reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater. (See *Brothers*, *supra*, 236 Cal.App.4th at p. 29; *Birks*, *supra*, 19 Cal.4th at p. 118 ["even absent a request, and even over the parties' objections, the trial court must instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser"]; see also *Breverman*, *supra*, 19 Cal.4th at p. 162 [trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence].) Accordingly, we must consider whether substantial evidence

17.

supports a verdict of attempted criminal threats instead of the greater offense of criminal threats. (See *Breverman*, at p. 162; *Birks*, at p. 118.)

Here, there was substantial evidence from which a jury could conclude defendant committed the offense of criminal threats, but not the lesser offense of attempted criminal threats. (See *People v. Haley*, *supra*, 34 Cal.4th at p. 312, quoting *Breverman*, *supra*, 19 Cal.4th at p. 162.) Smetana testified, while defendant was on top of him, defendant pinned Smetana's arms and Smetana was not able to fight back or even protect himself. Smetana begged defendant to stop, but defendant kept screaming he was going to kill Smetana. Smetana stated he believed defendant was going to kill him. Smetana requested a restraining order thereafter because the incident terrified him; he testified he still felt scared about what happened. The evidence strongly shows defendant's threat to kill Smetana actually caused him "to be in sustained fear for his … own safety." (See § 422.) Since the record supports each element of criminal threats, we conclude the trial court did not have a sua sponte duty to instruct on the lesser included offense of attempted criminal threats. (See *Brothers*, *supra*, 236 Cal.App.4th at p. 29; see also *Birks*, *supra*, 19 Cal.4th at p. 118.)

Defendant fails to demonstrate there was substantial evidence to support an instruction on attempted criminal threats. Defendant's argument that his threat to kill Smetana is not what caused Smetana to be in sustained fear of defendant, because Smetana was already in perpetual fear of defendant, is unpersuasive. Contrary to defendant's assertion, there was not substantial evidence to establish defendant's threat to kill Smetana did not cause Smetana to be in sustained fear. And we agree with the People that the plain language of section 422 does not require the threat conveyed to be the sole, primary, substantial or "but for" reason for the sustained fear.

Defendant's reliance on *Toledo*, *supra*, 26 Cal.4th 221 is misplaced. In *Toledo*, the defendant was found not guilty of criminal threats because when he told his wife he was going to kill her, the wife responded that she did not care. As such, the wife's

testimony at trial failed to establish that her husband's threat had actually caused her to be afraid. (*Id.* at p. 225.) In such circumstance, the court reasoned that an attempted criminal threat would exist where a defendant, with the requisite intent, makes a sufficient threat orally, directly to the intended victim, but the victim does not understand the threat, or, where "for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear" by the threat. (*Id.* at p. 231.)

Here, Smetana testified defendant's threat to kill him scared him and that he remained scared of defendant even after the incident. Smetana testified he believed defendant was going to kill him when defendant was straddling him, punching him, and telling him he was going to kill him. Smetana requested a restraining order after the incident because he was still scared about what happened. Therefore, unlike in *Toledo*, there was no evidence that defendant's threat to Smetana did not cause him to be in sustained fear for his life.

Contrary to defendant's claim, the fact that Smetana had a preexisting fear of defendant only bolsters Smetana's testimony that he believed defendant's threat to kill him. In *People v. Allen* (1995) 33 Cal.App.4th 1149, the victim's daughter's ex-boyfriend had been coming by her house and peeking in windows. (*Id.* at p. 1156.) The defendant later confronted the victim telling her " 'I'm gonna kill you. I'm gonna kill you and your daughter.' " (*Id.* at p. 1155.) As the defendant spoke, he pointed a gun at the victim. (*Id.* at pp. 1155–1156.) The victim knew the defendant had a practice of looking inside her home and had reported his conduct to the police on prior occasions. (*Id.* at p. 1156.) The court stated, "The victim's knowledge of [the] defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear." (*Ibid.*)

Similarly, in *People v. Fierro* (2010) 180 Cal.App.4th 1342, there was an earlier confrontation between the defendant and the victim. (*Id.* at p. 1345.) The defendant later

19.

returned with the obvious intent of confronting the victim again, this time to frighten him. (*Id*. at pp. 1345–1346, 1348.)  The court stated, "In light of the (albeit recent) history between these people, [the defendant] amply succeeded." (*Id.* at p. 1348.)  "[T]he minute during which [the victim] heard the threat and saw [the defendant's] weapon qualifies as 'sustained' [fear] under the statute.  When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory.' " (*Id.* at p. 1349.)

Here, like in *Fierro* and *Allen*, Smetana had a prior history with defendant. Smetana had an intimate relationship with defendant's girlfriend while defendant was in jail.  Smetana knew that defendant was in jail for placing Garzelli in a chokehold until she lost consciousness, which caused Smetana to be scared for Garzelli.  When defendant was released from jail, he told Smetana that whatever he had with Garzelli was over now that he was back.  Smetana testified he decided to carry a dagger because he had no idea what defendant was capable of.  This previous history between defendant and Smetana is relevant in establishing that defendant's threat to kill Smetana did cause Smetana to be in a state of sustained fear.  (See *People v. Allen*, *supra*, 33 Cal.App.4th at p. 1156.)

Irrespective, even if the trial court had a duty to instruct on the lesser included offense of attempted criminal threats, any error in failing to instruct was harmless.  Put differently, we cannot conclude it is reasonably probable defendant would have obtained a more favorable result had the jury been instructed on attempted criminal threats.  (See *Breverman*, *supra*, 19 Cal.4th at p. 178 ["in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836]"]; *People v. Gonzalez* (2018) 5 Cal.5th 186, 199; *People v. Rogers* (2006) 39 Cal.4th 826, 867–868.)[3]  As discussed above, there is

---

[3]    Although defendant suggests that any error here should be reviewed under the *Chapman v. California* (1967) 386 U.S. 18, 24 "harmless beyond a reasonable doubt" standard, the California Supreme Court has consistently held that error to instruct sua

20.

substantial evidence in the record supporting each element of the criminal threats offense. And we cannot conclude it is reasonably probable a jury would have concluded defendant's threat to kill Smetana, while beating him up and in light of defendant's prior history, did not cause Smetana to be in sustained fear.

Defendant contends it is reasonably probable he would have obtained a more favorable result had the jury been instructed on the crime of attempted criminal threats because there was a reasonable basis for the jury to doubt Smetana's testimony. Defendant argues the only evidence of defendant's threat to kill Smetana came from Smetana, who did not report the threat initially, and who lied under oath at the preliminary hearing about never seeing defendant before the incident at Garzelli's residence. However, the jury resolved the factual question regarding Smetana's credibility against defendant in convicting him of the criminal threats and battery counts, necessarily rejecting defendant's version of the events. (See *People v. Turner* (1990) 50 Cal.3d 668, 690 ["erroneous failure to instruct on a lesser included offense is not prejudicial if 'it is possible to determine that … the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions' "]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1155 [similar].)

Defendant argues that because the jury did not find him guilty on all counts, it shows their selective belief in the prosecution's witnesses and the closeness of the case, demonstrating the instructional error's prejudicial impact. We disagree. The fact that the jury did not find defendant guilty of attempted murder goes to whether the jury believed defendant actually intended to kill Smetana, not whether they believed defendant threatened to kill Smetana. And the counts related to inflicting corporal injury and assault with a deadly weapon relate to Garzelli and whether the jury believed her

sponte on lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under *People v. Watson*, *supra*, 46 Cal.2d at page 836. (See *Breverman*, *supra*, 19 Cal.4th at p. 178.)

testimony, not Smetana. As such, the fact that the jury found defendant not guilty on counts 1 and 5, and was deadlocked on count 3, is not relevant to the closeness of the case as to count 6, criminal threats. Consequently, we conclude any error by the trial court in not instructing on attempted criminal threats was harmless.

## II. The Trial Court Did Not Abuse its Discretion in Response to Defendant's *Pitchess* Motion

Defendant requests this court to conduct an independent review of the *Pitchess* proceeding to ensure that the trial court complied with the procedural requirements set forth in *People v. Mooc* (2001) 26 Cal.4th 1216, 1228–1229 (*Mooc*), and that it did not abuse its discretion in "refusing to disclose any of the contents of the officer's personnel records." (See *id.* at p. 1229.) The People have no objection to defendant's request but ask for leave of court to address the possibility of harmless error should we find the trial court abused its discretion.

### A. Relevant Procedural History

On February 11, 2020, defendant filed a *Pitchess* motion requesting an order from the court pursuant to section 1043 to produce and make available personnel records of Kern County Sheriff's Department for Deputy Vidal D. Contreras.[4] Specifically, in his written motion, defendant requested: "1. The names, addresses, and telephone numbers of all persons who have filed complaints with the Kern County Sheriff's Department … for acts indicating dishonesty, false arrest, illegal detention, and the fabrication of charges, evidence, or reports [emphasis omitted]. [¶] 2. Further, any and all information, including the names, addresses, and telephone numbers of all persons who have witnessed or participated in administrative or disciplinary action against the above-named deputy for failing to follow safety protocols and departmental guidelines. [¶] 3. Documentation of past officer misconduct which is similar to the misconduct alleged

---

[4] Although defendant's *Pitchess* motion referred to the deputy as Deputy Dustin Contreras, the personnel records show the deputy's true name is Vidal D. Contreras.

below by defense in the pending litigation. [¶] 4. The names, addresses, and telephone numbers of all persons interviewed by the Department, its investigators, or other personnel during investigation into the complaints described in item 1, 2, and 3 above. [¶] 5. The written procedures established by the Department to investigate citizen complaints against the Department or its personnel. [¶] 6. All records of the outcomes or dispositions of Departmental investigations against the above-named officers for conduct described in item 1, 2, and 3, and any discipline imposed as a result of such investigations. [¶] 7. The names, addresses, and telephone numbers of all persons who have filed complaints with the Department for acts indicating by the above-named deputies."

On February 18, 2020, the trial court conducted an in camera review and denied the motion in part and granted the motion in part. A court reporter was present at the hearing and made a record of the proceeding. After the court made its findings, it ordered the transcript of the in camera proceeding sealed.

At trial, the People designated Deputy Contreras as their chief investigating officer. However, Deputy Contreras did not testify at trial.

### B.     Standard of Review and Applicable Law

In *Pitchess*, the California Supreme Court "recognized that a criminal defendant may, in some circumstances, compel the discovery of evidence in the arresting law enforcement officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge." (*Mooc*, *supra*, 26 Cal.4th at p. 1219.) " 'In 1978, the California Legislature codified the privileges and procedures surrounding what had come to be known as "*Pitchess* motions" … through the enactment of Penal Code sections 832.7 and 832.8 and Evidence Code sections 1043 through 1045.' " (*Id.* at pp. 1219–1220.) "A criminal defendant has a limited right to discovery of a peace officer's personnel records. [Citation.] Peace officer personnel records are confidential and can only be discovered pursuant to Evidence Code sections 1043 and 1045." (*Giovanni B. v. Superior Court* (2007) 152 Cal.App.4th 312, 318.)

23.

The procedure for obtaining discoverable information from law enforcement personnel files is well established. Pursuant to Evidence Code section 1043, subdivision (b), "on a showing of good cause, a criminal defendant is entitled to discovery of relevant documents or information in the confidential personnel records of a peace officer accused of misconduct against the defendant. [Citation.] Good cause for discovery exists when the defendant shows both ' "materiality" to the subject matter of the pending litigation and a "reasonable belief" that the agency has the type of information sought.' [Citation.] A showing of good cause is measured by 'relatively relaxed standards' that serve to 'insure the production' for trial court review of 'all potentially relevant documents.' [Citation.] If the defendant establishes good cause, the court must review the requested records in camera to determine what information, if any, should be disclosed. [Citation.] Subject to certain statutory exceptions and limitations [citation], 'the trial court should then disclose to the defendant "such information [that] is relevant to the subject matter involved in the pending litigation." ' " (*People v. Gaines* (2009) 46 Cal.4th 172, 179 (*Gaines*).)

"When a trial court concludes a defendant's *Pitchess* motion shows good cause for discovery of relevant evidence contained in a law enforcement officer's personnel files, the custodian of the records is obligated to bring to the trial court all 'potentially relevant' documents to permit the trial court to examine them for itself." (*Mooc*, *supra*, 26 Cal.4th at pp. 1228–1229; *City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 84.) "A law enforcement officer's personnel record will commonly contain many documents that would, in the normal case, be irrelevant to a *Pitchess* motion, including those describing marital status and identifying family members, employment applications, letters of recommendation, promotion records, and health records." (*Mooc*, at p. 1229; see § 832.8.) Irrelevant documents need not be presented to the trial court for an in camera review. However, "if the custodian has any doubt whether a particular document is relevant, he or she should present it to the trial court" and "be prepared to state in

24.

chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion." (*Mooc*, at p. 1229.) "A court reporter should be present to document the custodian's statements, as well as any questions the trial court may wish to ask the custodian regarding the completeness of the record." (*Ibid*.)

"The trial court should then make a record of what documents it examined before ruling on the *Pitchess* motion" and the transcript of the in camera hearing and all copies of the documents should be sealed. (*Mooc*, *supra*, 26 Cal.4th at p. 1229; see *People v. Samayoa* (1997) 15 Cal.4th 795, 825 [after ruling on the *Pitchess* motion, "[t]he magistrate ordered that all remaining materials be copied and sealed"].) "Such a record will permit future appellate review." (*Mooc*, at p. 1229.)

The trial court's decision as to whether the contents of a police personnel file are discoverable is subject to review under the abuse of discretion standard. (See *Mooc*, *supra*, 26 Cal.4th at p. 1228.) When the trial court reviews an officer's file in camera and then denies disclosure of information, the reviewing court must examine the record of the documents examined by the trial court to determine whether the trial court abused its discretion. (*Id.* at pp. 1228, 1229, 1232; see *People v. Castain* (1981) 122 Cal.App.3d 138, 144–145.) "A trial court is afforded wide discretion in ruling on a motion for access to law enforcement personnel records. The decision will be reversed only on a showing of abuse of discretion." (*People v. Yearwood* (2013) 213 Cal.App.4th 161, 180, citing *People v. Hughes* (2002) 27 Cal.4th 287, 330.)

Any error by the trial court in denying a *Pitchess* motion is reviewed under the *Watson* harmless error standard. (See *People v. Samuels* (2005) 36 Cal.4th 96, 110, as modified (Sept. 21, 2005); *Gaines*, *supra*, 46 Cal.4th at pp. 181–185.)

### C.    *Analysis*

Defendant filed a *Pitchess* motion concerning Deputy Contreras, seeking discovery of complaints "for acts indicating dishonesty, false arrest, illegal detention, and the fabrication of charges, evidence, or reports." (Emphasis omitted.) We have conducted an independent review of both the in camera proceeding and of Deputy Contreras's personnel file. We conclude the trial court complied with the proper procedural requirements as set forth in *Mooc*, and created an adequate record of the in camera hearing. (*Mooc*, *supra*, 26 Cal.4th at p. 1228.) After examining the personnel files of Deputy Contreras, we further conclude the trial court did not abuse its discretion in denying the release of part of the personnel files. (See *id.* at pp. 1228–1229; *People v. Samayoa*, *supra*, 15 Cal.4th at p. 827.) We, therefore, uphold the trial court's ruling.

## III.    Assembly Bill 518 and Senate Bill 567

Defendant contends the enactment of Assembly Bill 518 requires that his case be remanded to the trial court for the court to exercise its discretion regarding whether to stay his conviction on count 4 rather than count 6 under section 654, as amended. Defendant also argues the matter should be remanded under Senate Bill 567, since he was sentenced to an upper term based on aggravating factors not found true under the new law. The People agree that defendant is entitled to the benefit of Assembly Bill 518 and that remand is required on that basis. The People do not address defendant's claim under Senate Bill 567, conceding that the trial court may revisit all prior sentencing decisions on remand. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425.)

### A.    *Relevant Factual Background*

On March 20, 2020, the jury convicted defendant of residential burglary (§ 460, subd. (a); count 2), battery with infliction of serious bodily injury (§ 243, subd. (d); count 4), and criminal threats (§ 422; count 6). On April 21, 2020, the court imposed the determinate term of seven years in state prison, comprised of the upper term of six years

on count 2, plus one year (one-third the midterm of three years) on count 4. The court imposed and stayed the upper term of three years on count 6.

### B. *Applicable Law*

Assembly Bill 518, which amended section 654, became effective January 1, 2022, while defendant's appeal was pending. "Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) Under the previous version of section 654, it was required that an act or omission that was punishable in different ways by different laws be punished under the law that provides for the longest possible term of imprisonment. (Former § 654, subd. (a).)

However, Assembly Bill 518 amended section 654 to provide that an act or omission that is punishable in different ways by different laws may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. (See § 654, subd. (a), as amended by Stats. 2021, ch. 441, § 1.) As such, the trial court is no longer required to impose punishment for the crime that carries the longest term of imprisonment, but now has discretion in deciding which term of punishment to impose.

Senate Bill 567, which also became effective on January 1, 2022, amends section 1170 by making the middle term the presumptive term of imprisonment unless certain circumstances exist. (See Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1), (2).) Under the newly amended law, the trial court may impose an upper term sentence only where there are aggravating circumstances and the facts underlying the aggravating circumstances have been stipulated by the defendant or found true beyond a reasonable doubt by a jury or court trial. (*Ibid*.) However, the trial judge may also rely on certified records of a defendant's prior convictions in determining the sentence to impose without submitting the prior convictions to a jury. (See Stats. 2021, ch. 731, § 1.3, amending § 1170, subd. (b)(3).)

27.

*C.*    *Analysis*

Both parties concede that count 4, battery with infliction of serious bodily injury, and count 6, criminal threats, arose from the same continuous course of criminal conduct, thereby implicating section 654.

Assembly Bill 518 amended section 654 to no longer require punishment under the longest possible term of imprisonment when multiple offenses are based on the same act or omission, which reduces possible punishment. In *In re Estrada* (1965) 63 Cal.2d 740, 748, the California Supreme Court held that, where the amended statute mitigates punishment and there is no saving clause, the amendment will operate retroactively to all defendants whose judgments are not yet final on the amendments' operative date. (See *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 306–308; *People v. Brown* (2012) 54 Cal.4th 314, 323; *People v. Frahs* (2020) 9 Cal.5th 618, 624; *People v. Francis* (1969) 71 Cal.2d 66, 76 [*Estrada* applies where a reduced punishment is possible].) Assembly Bill 518 reduces possible punishment and should apply retroactively to sentences that are not yet final. (See, e.g., *People v. Mani* (2022) 74 Cal.App.5th 343, 379–380 [concluding Assem. Bill 518 applies retroactively]; *People v. Sek* (2022) 74 Cal.App.5th 657, 673–674 [same].)

Here, defendant was sentenced on April 21, 2020, and subsequently filed this appeal. Thus, his case was not final when Assembly Bill 518 became effective on January 1, 2022. In defendant's case, the trial court now has discretion to impose an eight-month sentence (one-third the midterm (§§ 422, 18) on count 6 in lieu of the one-year sentence (one-third the midterm (§ 243, subd. (d))) that was imposed on count 4. Because defendant is entitled to the possible benefit of a reduced punishment under the amended section 654, remand is necessary to permit the court to exercise its newfound discretion under the amended statute. (See *People v. Navarro* (2007) 40 Cal.4th 668, 681.)

28.

Lastly, we agree with the parties that Senate Bill 567 operates retroactively, but we need not address the merits of defendant's claim under Senate Bill 567 because, as discussed, the matter is already being remanded to the trial court for resentencing. Defendant may raise his claim regarding further relief pursuant to Senate Bill 567 below at the time of resentencing.

## **DISPOSITION**

We remand the matter to the trial court for resentencing to permit the trial court to exercise its newfound sentencing discretion pursuant to Assembly Bill 518 and, if applicable, Senate Bill 567. In all other respects, we affirm the judgment.

DE SANTOS, J.

WE CONCUR:


HILL, P. J.


POOCHIGIAN, J.